

Priority
Send
Enter
Closed
JS-5/JS-6 _No_
JS-2/JS-3 _____
Scan Only _____

ENTERED
CLERK, U.S. DISTRICT COURT

JUL 14 2004

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT

JUL 1 2 2004

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MALLINCKRODT INC. AND NELLCOR PURITAN BENNETT, INC. | Case No: 00-6506 MRP (AJWx) |
| Plaintiffs, | |
| v. | MEMORANDUM OF DECISION AND ORDER RE: Post-Trial Motions |
| MASIMO CORP. and IVY BIOMEDICAL SYSTEMS, INC. | |
| Defendants. | |

DOCKETED ON CM

JUL 14 2004

BY _____ 013

The parties have each filed post-trial motions that include renewed motions for judgment as a matter of law (JMOL), argument on the equitable issues presented to the Court, and other post-trial matters. This memorandum of decision and order addresses these submissions, and concludes that claims 16 and 23 of the '222 patent are literally infringed, claim 17 of the '850 patent is literally infringed, the '785 patent is not infringed, the '830 patent is unenforceable, and that the infringement was not willful. Otherwise, the jury's verdict has not been affected. Although the '222 and '850 patents are valid, enforceable, and infringed, the Court has concluded that an injunction is not in the public interest and that damages will

622

1  sufficiently compensate Masimo for its losses due to the infringement

2  of its patents.

3      Having considered the parties' arguments, both oral and written,

4  the Court makes the following rulings: 1) Nellcor's motion for JMOL

5  on liability issues is <u>granted</u> as to claims 29 and 30 of the '785

6  patent, <u>granted</u> as to willfulness on all patents, and <u>denied</u> as to all

7  other liability issues; 2) Nellcor's motion for a new trial on

8  liability issues is <u>denied</u>; 3) Nellcor's motion for JMOL on damages

9  issues is <u>denied</u>; 4) Nellcor's motion for a new trial on damages

10 issues is <u>denied</u>; 5) Nellcor's indefiniteness defense is <u>denied</u>; 6)

11 Nellcor's unenforceability defense is <u>granted</u> as to the '830 patent,

12 and <u>denied</u> as to the remaining patents; 7) Masimo's motion for JMOL of

13 literal infringement of the Kalman claims is <u>granted</u>; 8) Masimo's

14 request for an injunction is <u>denied</u>; 9) Masimo's proposal for damages

15 for infringing sales made after December 31, 2003 will require further

16 consideration. The Court's decision on damages and prejudgment

17 interest will require an additional hearing.

18

19                            **- INTRODUCTION -**

20 **I.   BACKGROUND**

21     **A.   <u>Procedural History</u>**

22     The Court held a six week trial of this case during February and

23 March 2004. Masimo Corp. ("Masimo") claimed that Mallinckrodt, Inc.

24 and Nellcor Puritan Bennett, Inc. (collectively, "Nellcor") were

25 infringing Masimo's '222, '785, '830, and '850 patents, and that this

26 infringement was willful. Nellcor charged Masimo with infringement of

27 one patent, its '000 patent, and argued that Masimo's '222, '785,

28 '830, and '850 patents were invalid. The jury's verdict was that

Nellcor had willfully infringed each of Masimo's four asserted patents, either literally or under the doctrine of equivalents, and that Masimo had not infringed Nellcor's patent. Verdict Form (filed March 15, 2004). The jury awarded Masimo $134,528,960 in lost profits and reasonable royalty. Joint Judgment on Jury Verdict (filed April 5, 2004); Damages Jury Verdict (filed March 23, 2004). Following this damages verdict, this Court heard evidence on equitable issues on March 24 and 25, 2004.

**B. Patents**

Masimo asserted four patents in this case, and Nellcor asserted one. Each of these patents relates to pulse oximetry, which is a non-invasive measurement of arterial blood saturation.[1]

In pulse oximetry, a sensor is attached to the patient's finger and light from an emitter in the sensor is sent through the oxygen-carrying arteries in the patient's tissue. A detector measures the amount of light that is transmitted through the finger. Because differing levels of oxygen in the blood alter the amount of light waves transmitted through the patient's tissue (a phenomenon known as "energy attenuation"), the amount of light absorbed can be used to calculate an oxygen level.

Although the sensor should ideally only detect signals from the patient's arterial blood, the signal is often accompanied by "noise" resulting from patient movement, muscular movement, and vessel movement. Movement can cause the properties of energy attenuation to vary erratically, and thus can affect the accuracy of the oxygen

---

[1] The descriptions of pulse oximetry and the patents-in-suit that are contained in this section are intended for informational purposes only, and do not constitute rulings of this Court.

1   saturation reading. To resolve this issue, filters, which generally

2   consist of a processor and software running a particular filtering

3   algorithm, are employed to eliminate the unwanted noise. The noise

4   sought to be filtered is erratic, rather than constant, so

5   manufacturers employ "adaptive filters" which have the ability to

6   identify and filter varying levels of noise.

7           1.   Masimo's Patents

8       Each of Masimo's four asserted patents is related in that they

9   are all continuations of the '060 application, which was filed March

10  7, 1991 and later abandoned. Generally, each of these patents relates

11  to optimizing the signal that results when light is passed through a

12  physiologic sample, such as a patient's finger, creating signals with

13  both primary (desired) and secondary (noise) components. During trial,

14  the jury found that each of Masimo's asserted patents was valid and

15  infringed.

16          a.   '785 Patent

17      The first of Masimo's patents to issue was the '785 patent, which

18  is titled "Signal Processing Apparatus and Method" but was called the

19  "Linear Relationship" patent during the trial. U.S. Patent No.

20  5,769,785 ("'785 patent"); JTX 202. Masimo asserted independent claim

21  29 and claim 30, which depends from claim 29, against Nellcor's O5Ci

22  products. The method described in the '785 patent is a method of

23  taking physiologic measurements by passing light energy of two

24  wavelengths through a physiological medium to generate two signals,

25  each of which includes both the desired measurement and a secondary

26  "noise" component. '785 patent, col.54:1-21. The wavelengths that are

27  passed through the medium are chosen such that there will be a

28  substantially linear relationship between the noise component of each

4

1   of the generated signals; this linear relationship is then used to

2   remove the noise component from the signals. *Id.*

3       The '918 application that became the '785 patent is a division of

4   the '690 application that became the '036 patent. The '690 application

5   is a continuation of the '060 application that was filed March 7, 1991

6   but subsequently abandoned. The '918 application was filed on June 7,

7   1995 and the patent issued on June 23, 1998. The term of the patent is

8   limited to that of U.S. Patent No. 5,490,505 ("'505 Patent"), which

9   was issued on February 13, 1996.

10                      b.   '850 Patent

11      The second of the patents-in-suit to issue, the '850 patent, is

12  titled "Signal Processing Apparatus" but was called the "Parallel

13  Engine" patent during trial. U.S. Patent No. 6,157,850 ("'850

14  patent"); JTX 212.  Masimo asserted independent claim 1, and claims

15  10-12, 15, 17 and 22, which depend from claim 1, against Nellcor's O4,

16  O5, and O5Ci products. These claims describe a method of parallel

17  processing of and arbitration between two separate signals (such as

18  the signals described in the '785 patent). '850 patent, col. 109:1-16,

19  45-52, 60-63, 66-67, col 110: 11-15. In claim 17, the signals are

20  adaptively filtered using a Kalman filter. '850 patent, col. 109:66-

21  67.

22      The '850 application is a continuation-in-part of the '812

23  application that became the '505 patent and of the '690 application

24  that became the '036 patent. The '690 application that became the '036

25  patent was a continuation of the '060 application. The first

26  application to describe arbitrating between alternative pathways was

27  filed October 7, 1994. The application that became the '850 patent was

28  filed May 16, 1997 and claim 17, which references a Kalman filter, was

                                    5

1   added on November 20, 1998. The '850 patent issued on December 5,

2   2000. A terminal disclaimer limits the term of the '850 patent to that

3   of the '272 patent, which was issued May 17, 1997. JTX 212, FH1895-96;

4   U.S. Patent No. 5,632,272.

### c.   '830 Patent

6      During the trial the '830 patent, which is titled "Signal

7   Processing Apparatus and Method", was described as the "Self-

8   Optimizing Filter" patent. U.S. Patent No. 6,206,830 B1 ("'830

9   Patent"); JTX 206. Masimo asserted independent claim 9, claim 14,

10  which depends from claim 9, independent method claim 20, and claim 25,

11  which depends from claim 20 against Nellcor's O4, O5 and O5Ci

12  algorithms. The apparatus claims describe a pulse oximeter comprising,

13  and the method claims describe a process including, among other

14  features, a filter responsive to signals like those described in the

15  '785 and '850 patents and that adjusts itself in response to changes

16  in the signals to optimize the output from the signals. '830 Patent,

17  col.44:1-33, 42-43, 63, col.45:1-8, 17-18.

18     The '830 patent has the same specification as the '642 and '785

19  patents. It is a continuation of the '642, which is a continuation of

20  '785 patent, which is a continuation of the '036 patent, which is a

21  continuation of the now-abandoned '060 application. The application

22  that resulted in the '830 patent was filed on November 17, 1999 and

23  the patent issued on March 27, 2001. The term of the '830 patent is

24  limited, by a terminal disclaimer, to the term of the '785 patent. JTX

25  207, FH0874.

### d.   '222 Patent

27     The '222 patent was referred to as the "Kalman Filter" patent

28  during the trial. U.S. Patent No. 6,263,222 B1 ("'222 Patent"); JTX

210. Masimo asserted independent method claim 1, claim 4, which depends from claim 1, independent apparatus claim 16, independent apparatus claim 17, and claims 18, and 21-23, which depend from claim 17 against Nellcor's O4, O5, and O5Ci algorithms. These claims describe filtering the signals described in Masimo's other asserted patents to derive arterial oxygen saturation. '222 Patent, col 73:1-18, 26-29, col. 74: 42-56, 57-67, col.75:1-11, col.76:5-10. Claims 1, 4, 16, and 23 utilize Kalman filter limitations. '222 Patent, col.73:1-18, 26-29, col.74:42-56, col.76:9-10.

The '222 patent is a continuation of the '505 patent, which was a continuation-in-part of the '060 application. The application was filed on October 6, 1997. Kalman filter language was first added on October 16, 1998. This language was amended on November 20, 1998, March 20, 2000 and August 18, 2000. The patent issued on July 17, 2001.

### 2.   Nellcor's '000 Patent

Nellcor's '000 patent is entitled "Adhesive Pulse Oximeter Sensor with Reusable Portion." U.S. Patent No. 36,000 ("'000 Patent"), JTX 106. Independent apparatus claims 18, and claims 21, 23-24, and 26, which depend from claim 18, were asserted against Masimo's first and second generation patient cables and disposable sensors. These claims describe a sensor with a disposable component that is connected to the patient, a cable to connect the sensor to an external monitor, and a means for connecting the two. '000 Patent, col.7:33-8:12, 17-18, 22-25, 31-33.

The '000 patent is a reissue of the '230 patent that was issued on May 11, 1993. Each of the asserted claims is part of the reissue.

1  The '964 application that resulted in the '000 patent was filed on May

2  10, 1995 and the patent issued on December 22, 1998.

3

4  **II.**     **MOTIONS AT ISSUE**

5       **A.**     **Filings**

6       Masimo filed a renewed motion for JMOL on April 15, 2004, and its

7  consolidated memorandum on post-trial motions on May 6, 2004.

8  Memorandum of Points and Authorities in Support of Masimo's Motion

9  for: 1) Judgment as a Matter of Law that Nellcor Literally Infringes

10 Claim 17 of the '850 patent and Claims 16 and 23 of the '222 Patent;

11 2) A Permanent Injunction, 3) An Accounting for Infringing Sales

12 Occurring in 2004, and 4) Prejudgment Interest. ("M.Mot"). Masimo

13 filed two declarations and a supplemental appendix in support of this

14 motion. Declaration of Joseph S. Cianfrani in Support of Masimo's

15 Motion (filed May 6, 2004) ("Cianfrani Decl."); Declaration of Michael

16 J. Wagner in Support of Masimo's Motion (filed under seal May 7, 2004)

17 ("Wagner Decl."); Masimo Corp's Supplemental Appendix (filed June 8,

18 2004).

19      Nellcor also filed a renewed motion for JMOL on April 15, 2004.

20 Nellcor's consolidated memorandum dealing with equitable relief and

21 post-trial motions was filed on May 6, 2004. Nellcor's Memorandum of

22 Points and Authorities in Support of: 1) Argument on Bench Trial and

23 2) Renewed Motion for Judgment as a Matter of Law or Alternatively, a

24 New Trial (filed May 6, 2004) ("N.Mot"). Nellcor filed five appendices

25 along with its Motion. Appendices to Nellcor's Memorandum of Points

26 and Authorities (filed May 6, 2004)("N.App").

27      Each party opposes the other party's motions. Masimo's Memorandum

28 of Points and Authorities in Opposition to Nellcor's 1) Argument on

1    Bench Trial; and 2) Renewed Motion for Judgment as a Matter of Law or

2    for a New Trial (filed May 27, 2004)("M.Opp"); Nellcor's Opposition to

3    Masimo's Motion for Judgment as a Matter of Law and Other Post-Trial

4    Issues (filed May 27, 2004)("N.Opp") ; May 26, 2004 Declaration of

5    Brain C. Dragun (filed May 27, 2004)("Dragun Decl."); Declaration of

6    Christopher Jones in Opposition to the Motion for Permanent Injunction

7    (filed May 27, 2004)("Jones Decl."); Declaration of David A Sell in

8    Opposition to Motion for Permanent Injunction (filed May 27,

9    2004)("Sell Decl."). The parties jointly lodged a twelve-volume

10   appendix, which consists of trial exhibits and testimony relevant to

11   the post-trial proceedings. Joint Appendix (lodged June 8, 2004).

12        **B.    Hearings**

13        On June 18, 2004 the Court heard oral argument on Masimo's

14   request for an injunction. The remaining issues discussed in this

15   memorandum of decision were extensively briefed, both in these post-

16   trial proceedings and when the motions for JMOL were originally filed

17   during trial. Except for the argument on damages expressly requested

18   by the Court in this Order, the Court has concluded that oral argument

19   on the remaining issues would not assist the Court in its decisions.

20        **C.    Issues**

21        The parties' post trial motions present four main issues: 1)

22   whether, as is suggested by the parties' motions for judgment as a

23   matter of law, the evidence is insufficient to support parts of the

24   jury's verdict, 2) whether there is merit to Nellcor's equitable

25   claims of indefiniteness and unenforceability; 3) whether Nellcor is

26   entitled to a new trial if its motions for judgment as a matter of law

27   are not granted, and 4) whether Masimo is entitled to an injunction.

28

# - JUDGMENT AS A MATTER OF LAW -

Both parties have made renewed motions for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure (FRCP). FRCP Rule 50(a)(1) establishes the standard by which this Court must consider the parties' motions for judgment as a matter of law:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

FRCP Rule 50(a)(1). In accordance with this standard, this Court should grant JMOL if substantial evidence does not support the jury's factual findings, or if those factual findings cannot support the legal conclusions implied from the jury's verdict. *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1252-53 (Fed. Cir. 2004).

A District Court may overturn a jury's verdict only if reasonable jurors could not have reached that verdict on the record that was before them. *Electro Sci. Indus. v. Gen. Scanning, Inc.*, 247 F.3d 1341, 1349 (Fed. Cir. 2001); *Burroughs Wellcome Co. v. Barr Lab.*, 40 F.3d 1223, 1227 (Fed. Cir. 1994)(noting that JMOL is appropriate only if the Court's conclusion is "the only one possible under the controlling law"); *Bell v. Clackmas County*, 341 F.3d 858, 865 (9th Cir. 2003)(noting that the Court "may not make credibility determinations and must draw all inferences in [the non-moving party's] favor, disregarding all evidence favorable to the defendants that the jury was not required to believe"). This Court must view the

evidence in the light most favorable to the non-moving party, draw all reasonable inferences in favor of the non-moving party, and consider whether there is sufficient evidence in the record to support the jury verdict. *Horphag Research Ltd. v. Pelligrini*, 337 F.3d 1036, 1040 (9th Cir. 2003); *McEuin v. Crown Equip. Corp.*, 328 F.3d 1028, 1036 (9th Cir. 2003).

## I.   INFRINGEMENT

The jury determined that Nellcor infringed each of Masimo's asserted patents, and that Masimo did not infringe Nellcor's patent. Verdict Form, Q.1-8, 14-15. The parties challenge three aspects of the jury's verdict.[2] First, both parties challenge the jury's verdict that the Kalman claims in the '222 and '850 patents were infringed under the doctrine of equivalents. Next, Nellcor argues that the evidence does not support the jury's finding that claims 29 and 30 of the '785 patent were literally infringed. Finally, Nellcor argues that the evidence does not support the jury's finding that Nellcor's '000 patent was not infringed.

The Court <u>denies</u> the first and third of these challenges to the jury's verdict, but <u>grants</u> Nellcor's motion for JMOL that claims 29 and 30 of the '785 patent are not infringed. This ultimately results

_____

[2] Several aspects of the jury's infringement verdict have not been challenged in the parties motions for judgment as a matter of law. Neither party contests the jury's finding that Nellcor's O4, O5, and O5Ci products infringe the asserted claims of the '830 patent. Verdict Form, Q.3. Although they dispute the Kalman claims in the '222 and '850 patents that were found to be infringed under the doctrine of equivalents, neither party contests the claims in the '222 and '850 patents that were found to be literally infringed. Verdict Form, Q.1,5. Thus the jury's verdict that Nellcor's products infringe claims 9, 14, 20 and 25 of the '830 patent, claims 17, 18, 21 and 22 of the '222 patent, and claims 1, 10, 11, 12, 15, and 22 of the '850 patent stands unchallenged by these motions.

11

in the conclusion that claims 16 and 23 of the '222 patent and claim 17 of the '850 patent are literally infringed, and claims 1 and 4 of the '222 patent are infringed under the doctrine of equivalents.

## A.   Kalman Claims

Each of the claims that were found to be infringed under the doctrine of equivalents involves a Kalman filter. '222 patent, claims 1,[3] 4,[4] 16,[5] and 23;[6] '850 patent, claim 17[7] (collectively, "Kalman claims"). Masimo seeks JMOL that Nellcor's products used Kalman filters, and thus that the Kalman claims were literally infringed.

---

[3] Claim 1 includes, as one of the steps of a claimed method of physiological monitoring, "determining arterial oxygen saturation during motion by filtering at least one of said intensity signals wit [sic] a Kalman filter to generate an approximation of arterial oxygen saturation during motion . . .". '222 patent, col. 73:2-18.

[4] Although the language of claim 4 does not mention a Kalman filter, claim 4 depends from claim 1, which does require a Kalman filter. '222 patent, col. 73: 26-29.

[5] Claim 16 is an independent claim describing a pulse oximeter comprising, among other features, "a processor responsive to the [sic] at least two intensity signals to determine an approximation of arterial oxygen saturation in the presence of motion induced noise, wherein the processor comprises a Kalman filter." '222 patent, col. 74:43-56.

[6] Claim 23 depends from claim 17, which describes a physiological monitor that computes arterial oxygen saturation in tissue material having arterial and venous blood. '222 patent, col.74:57-75:8. In addition to the limitations of claim 17, and those imposed by other claims that depend on claim 17 and from which claim 23 also depends, claim 23 adds the limitation "wherein said adaptive filter comprises a Kalman filter." '222 patent, col. 76:8-9.

[7] Claim 17 depends from claim 1, which describes a method of improving the determination of a physiological parameter based upon physiological signals. '850 patent, col. 109:2-16. In addition to the limitations of claim 1, and those imposed by other claims that depend on claim 1 and from which claim 17 also depends, claim 17 adds the limitation "wherein said step of filtering comprises filtering said signals with a Kalman filter."

M.Mot:2-11.[8] Nellcor seeks JMOL that the Kalman claims were not infringed at all. N.Mot:42-44. The Court <u>grants</u> Masimo's motion and <u>denies</u> Nellcor's motion.

### 1.   Literal Infringement

It is undisputed that Nellcor's accused products utilize Kalman filters.  *See* Friedlander Cross 1973:17-21[9] (describing Nellcor's two Kalman filters, Kalman C-Lock and Kalman SAT). Masimo argues that because its patents claim Kalman filters, and because Nellcor's products use Kalman filters, the Kalman claims are literally infringed. M.Mot:5-11.

There are three theories the jury could have adopted that would be consistent with its verdict that the Kalman claims were infringed only under the doctrine of equivalents.[10] First, the jury could have concluded that an equivalent of the Kalman filter, but not a Kalman filter, performs the claimed function in Nellcor's products. Next, the jury could have concluded that Nellcor's products use a Kalman filter,

---

[8] Masimo seeks judgment as a matter of law of literal infringement for claims 16 and 23 of the '222 patent and claim 17 of the '850 patent, not for claims 1 and 4 of the '222 patent, which were also Kalman claims. This is presumably because claims 16 and 23 of the '222 patent and claim 17 of the '850 patent add only the limitation of a Kalman filter to the claims from which they depend, which were found literally infringed, and it is thus possible to isolate the Kalman limitation as the reason the jury found these claims to be infringed only under the doctrine of equivalents. However, claim 1 of the '222 patent is an independent claim, and claim 4 depends from claim 1, so it is not possible to isolate the Kalman limitation, as opposed to other limitations in the claim, as the reason the jury did not find literal infringement.

[9] Unless otherwise indicated, references to testimony are references to the trial transcript.

[10] Claims 16 and 23 of the '222 patent are apparatus claims. Claims 1 and 4 of the '222 patent and claim 17 of the '850 patent are method claims. The analysis in this section considers infringement of both types of claims.

1 │ but not in the same way or for the same function that Kalman filters
2 │ are used in Masimo's patents. Finally, the jury could have concluded
3 │ that Nellcor's products use a Kalman filter to perform the claimed
4 │ functions, but a different type of Kalman filter than that described
5 │ in the patent. The first two theories are not reasonable in light of
6 │ the evidence; the final theory compels a finding of literal
7 │ infringement.

8 │     To support the first theory, the jury would have had to determine
9 │ that a filter that was an equivalent to a Kalman filter, but not a
10 │ Kalman filter, performed the claimed functions. No evidence was
11 │ presented to support this theory. Nellcor's products utilize
12 │ synchronous averaging Kalman filters, which is a type of Kalman
13 │ filter. N.Mot:43. There was no evidence that Nellcor's accused
14 │ products utilize any non-Kalman filter to perform the functions
15 │ described in the '222 and '850 patents as being performed by Kalman
16 │ filters. Consequently, a jury could not have reasonably concluded that
17 │ a filter equivalent to a Kalman filter, but that was not a Kalman
18 │ filter, performed the claimed functions.

19 │     The second possible conclusion, that Nellcor's Kalman filters are
20 │ utilized differently than the Kalman filters described in the '222 and
21 │ '850 patents, is equally unreasonable. To have determined that the
22 │ Kalman claims were only infringed under this theory, the jury would
23 │ have had to accept some evidence that Nellcor's Kalman filters are
24 │ used for a function or in a manner that is equivalent, but not
25 │ identical, to the claimed method. There was no evidence or argument to
26 │ support that conclusion. *See* N.Mot: 3-5 (arguing that Nellcor uses a
27 │ different type of Kalman filter, but not contending that Nellcor uses
28 │ a Kalman filter in a different manner).

1    The third theory supposes that the jury reached a definition of

2  Kalman filter narrower than Masimo's interpretation, and found that

3  Nellcor's synchronous averaging filters were equivalent, but not

4  identical, to the Kalman filters described in the claim. The record

5  supports the idea that there are many variants of Kalman filters.

6  3/4/04 Friedlander Direct 1899:15-1900:17. However, Masimo's claims

7  are not limited to any particular type of Kalman filter. Thus if the

8  jury found that one type of Kalman filter in Nellcor's products

9  performs the functions described in the patents as being performed by

10  Kalman filters, the only reasonable conclusion was that there was

11  literal infringement.

12    Because the only reasonable conclusion the jury could have

13  reached compels a finding of literal infringement, Masimo's motion for

14  JMOL of literal infringement of claims 16 and 23 of the '222 patent

15  and claim 17 of the '850 patent is <u>granted</u>.

16         **2.   No Infringement**

17              <u>a.</u>   Construing "Kalman Filter"

18    Nellcor uses its motion for judgment as a matter of law to argue,

19  once again, that the "Kalman filter" described in Masimo's patents is

20  narrower than the plain language of the claims. N.Mot:42-44 (citing

21  *Masimo Corp. v. Mallinckrodt Inc.*, 18 Fed. Appx. 852 (Fed. Cir.

22  2001)("*Masimo I*")).[11] Unlike the '222 and '850 patents in this case,

23  _____

24        [11] In *Masimo I*, the Federal Circuit was faced with determining
   the proper claim construction of the terms "adaptive filter" and
25  "adaptive signal processor," as used in Masimo's U.S. Patent No.
   6,036,642 (issued Mar. 14, 2000) (the "'642 patent"), which shares the
26  same specification as the '785 and '830 patents in this suit. The
   District Court declined Masimo's invitation to interpret the claim
27  terms "adaptive filter" and "adaptive noise canceller" to mean a
   generic adaptive filter; instead, it construed the term to mean "only
28  one specific type of adaptive filter, an adaptive noise canceller."

1  the '642 patent considered in *Masimo I* did not explicitly claim Kalman

2  filters. In *Masimo I* the Court found that in light of the claims,

3  specification, and prosecution history the "adaptive filter" and

4  "adaptive signal processor" claims that were asserted against

5  Nellcor's products were limited to adaptive noise cancellers. The

6  *Masimo I* Court issued summary judgment of non-infringement because it

7  found that the Kalman filters in Nellcor's products were not adaptive

8  noise cancellers that worked in the manner described in the '642

9  patent.  This Court has previously declined to narrow the claim terms

10  in this case to include only adaptive noise cancellers because the

11  claim terms in the '222 and '850 patents explicitly claim Kalman

12  filters. In accordance with the longstanding principle of claim

13  construction that one should not read limitations into the claim from

14  the specification this Court refused to limit the '222 and '850

15  claims. Claim Construction Order, pp.11. The Court thus finds no merit

16  in Nellcor's argument that the Court should have further defined the

17  term "Kalman filter" in the '222 and '850 patents.[12]

18      Because Masimo's claims describe Kalman filters generally, not a

19  specific type of Kalman filter, the only reasonable conclusion from

20  the evidence is that these claims were literally infringed. For this

21  reason, and for the reasons for granting JMOL of literal infringement

22  ――――――――――――――

23      [12] Even if this Court had defined "Kalman filter" to be limited
to least squares filters, this would not have affected the jury's
24  verdict. The jury's verdict that the Kalman claims were adequately
described indicates acceptance of testimony and evidence that least
25  squares filters are mathematically equivalent to Kalman filters. *See*
Enablement in Section II, *infra*, for this discussion. Thus, as
26  Nellcor's products utilize Kalman filters, and as the jury evidently
accepted that Kalman filters and least squares filters were
27  mathematical equivalents, had this Court narrowed the definition of
Kalman filters the jury would have still found that Nellcor's products
28  infringe under the doctrine of equivalents.

16

1  stated above, the Court underlines denies Nellcor's motion for JMOL of no

2  infringement as to claims 16 and 23 of the '222 patent, and claim 17

3  of the '850 patent. The argument that the Kalman claims should have

4  been defined is unpersuasive as to claims 1 and 4 of the '222 patent

5  as well, but further discussion of these claims, as considered below,

6  is warranted.

7                    b.    '222 Patent: Claims 1 and 4

8       At this point in the analysis, the jury's verdict that claims 1

9  and 4 of the '222 patent are infringed under the doctrine of

10 equivalents is undisturbed.[13] In addition to the argument – rejected

11 above – that the Kalman claims should have been defined, Nellcor

12 proffers an additional reason for disturbing the jury's verdict on

13 infringement of claims 1 and 4 of the '222 patent.

14      Claims 1 and 4 of the '222 patent require "filtering at least one

15 of said intensity signals with a Kalman filter to generate an

16 approximation of arterial oxygen saturation. . . ." '222 patent, JTX

17 3541, col. 73:1-29. Nellcor insists that claim 1 requires the output

18 of a Kalman filter to be oxygen saturation, and argues that because

19 its Kalman C-lock filter must be combined with a separate signal

20 processor to create an oxygen saturation output it cannot infringe

21 these claims. N.Mot:42. However, the jury's verdict to the contrary

22 can be supported by the record. Masimo's expert testified that the

23 Kalman filter that generates "an approximation of arterial oxygen

24 saturation during motion" does not have to be the same Kalman filter

25 that "generate[s] an approximation of arterial oxygen saturation."

26

27

28
       [13] As is previously noted, Masimo's motion for JMOL did not
    challenge the jury's verdict regarding claims 1 and 4 of the '222
    patent.

                              17

1 Goldberg Direct 2443:17-2444:12. The jury may have concluded that by

2 using a Kalman filter to perform the filtering step and then

3 calculating oxygen saturation, Nellcor's accused products infringed

4 this claim under the doctrine of equivalents. While perhaps not the

5 conclusion this Court would have reached, the jury's verdict is not so

6 unreasonable, in light of the evidence, that this Court will disturb

7 it.

8     There is adequate support for the jury's verdict that claims 1

9 and 4 of the '222 patent were infringed under the doctrine of

10 equivalents. A reasonable jury may have concluded, based on the

11 evidence, that Nellcor's Kalman C-lock filter and separate signal

12 processor infringed claims 1 and 4 of Masimo's '222 patent under the

13 doctrine of equivalents. There is also no basis (as determined in

14 subsection (a)) for concluding that the Kalman limitations in these

15 claims required further construction. Consequently, this Court <u>denies</u>

16 Nellcor's motion for JMOL related to infringement of claims 1 and 4 of

17 the '222 patent.

18     **B.**   **'785 Patent**

19     Masimo accused Nellcor's O5Ci products of infringing claims 29

20 and 30 of the '785 patent, and the jury found that both claims were

21 literally infringed. Verdict Form, Q.6. Claim 29 is an independent

22 claim describing a method of taking a physiological measurement; claim

23 30 depends from claim 29. '785 patent, col.54:17-21.[14]

24

25       [14]   The method described in claim 29 is comprised of the
following steps:

26           passing light energy of at least first and second
wavelengths through a light-absorptive physiologic

27           medium to a light-sensitive detector to generate,
respectively, first and second signals . . . the

28           first and second wavelengths selected based on
light absorption characteristics of the

Nellcor asserts three reasons it believes that there is no support for the jury's finding that the '785 patent was literally infringed. The first two of these arguments are unpersuasive, but the third is convincing and is the basis for this Court's decision to grant Nellcor's motion for JMOL that Masimo failed to present sufficient evidence to support the jury verdict that claims 29 and 30 of the '785 patent were literally infringed.

First, Nellcor argues that the "selected based on . . ." limitation is not met because Nellcor selected its light wavelengths in 1982, nine years before the '785 patent application was filed, and continued using the same wavelengths in its O5Ci products. N.Mot:41. In trial Mr. Corenman from Nellcor testified that he selected the wavelengths for properties, such as cost, that had nothing to do with the linear relationship. Corenman Direct 1463:9-1464:5, 1473:15-19, 1557:4-13. If Mr. Corenman's testimony is accepted, then the "selected based upon . . ." limitation of claim 29 is probably not infringed, but the jury apparently rejected Mr. Corenman's testimony. Rather than accepting Mr. Corenman's testimony that it is essentially a coincidence that the wavelengths in Nellcor's products are those covered by Masimo's patent claims, a reasonable jury may have inferred an intent to take advantage of the linear relationship from the fact that Nellcor's accused O5Ci products contained those wavelengths.

> physiologic medium such that a substantially
> linear relationship exists between the secondary
> portion of the first and second signals; and
> combining said first and second signals to
> generate a signal which is primarily correlated to
> the physiologic measurement portions, the step of
> combining comprising using the linear relationship
> to substantially remove the secondary portion of
> the signals.

'785 patent, col.54:1-16.

1  Consequently, this Court cannot base judgment as a matter of law on

2  Nellcor's argument that the "selected based upon . . ." limitation was

3  not infringed.

4      Second, Nellcor argues that another limitation requires "first

5  and second signals" generated by light passing though the tissue (the

6  red and infrared signals) to be combined, but that Masimo identified

7  only the noise signals (not red and infrared signals) in Nellcor's

8  technology as being combined. N.Mot:41. However, Masimo's expert, Mr.

9  Goldberg, testified that the software specification for Nellcor's O5Ci

10  products shows "a linear combination of IR and red derived values"

11  that is identical in structure and form to the linear combiner in the

12  '785 patent. Goldberg Direct 820:17-25. A reasonable jury could have

13  accepted this testimony; this Court will not grant judgment as a

14  matter of law on this basis.

15      Finally, Nellcor argues that the signal resulting from the

16  combination of the two signals in Nellcor's O5Ci algorithm is a noise

17  signal and thus can neither be correlated to the physiologic

18  measurement portions of the "first and second" signals nor can it be a

19  signal from which noise is "substantially removed." N.Mot:41 (citing

20  Friedlander Direct 1968:3-7). Masimo proffers the software

21  specification for the adaptive comb filter in the O4 algorithm and

22  suggests that it shows that the $\varepsilon_{mix}$ signal is more than a noise signal

23  because it allows the adaptive comb filter to track the pulse rate

24  which, of course, is a physiologic measurement. *See* JTX

25  2755:NC1015943-45; M.Opp:36. This interpretation of the software

26  specification is by no means apparent from reading it, and Masimo

27  offered no expert testimony that the specification could be

28  interpreted this way. Additionally, the specification that Masimo

1  proffers references the O4 algorithm, not the O5Ci algorithm that

2  Masimo accused. There is consequently no evidence that supports the

3  jury's determination that the $\varepsilon_{mix}$ signal is correlated to the

4  physiologic measurement portions of the "first and second" signals and

5  that it is a signal from which noise is "substantially removed."

6  Because no evidence was presented from which a reasonable jury could

7  have drawn this conclusion, the Court grants Nellcor's motion for

8  judgment as a matter of law that Masimo presented insufficient

9  evidence to support the jury's determination that claims 29 and 30 of

10  the '785 patent are literally infringed.

11  **C.   '000 Patent**

12  The jury found that neither Masimo's first nor its second

13  generation cables and sensors infringed the asserted claims of

14  Nellcor's '000 patent. Verdict Form, Q.14-15. Nellcor argues that such

15  a finding is contrary to the evidence, and thus that the jury erred in

16  rejecting Nellcor's infringement claim in its '000 patent. N.Mot:52-

17  53. Nellcor's motion for JMOL that the '000 patent was infringed is

18  denied because Nellcor has not met its burden to show that no

19  reasonable jury could have found that infringement did not occur.

20  **1.   First Generation Cables**

21  The evidence supports the jury's verdict that Nellcor has not

22  proved that Masimo's first generation cables infringed Nellcor's '000

23  patent. Masimo presented evidence that its first generation cables

24  were not made, used, sold, offered for sale or imported after the '000

25  patent issued. Cronin Direct 2296:23-2298:1 (testifying that Masimo's

26  manufacturing records, device history records, and sales records show

27  no manufacture or sales after December 22, 1998 – the date the '000

28  patent issued); see also Cronin Cross 2308:17-25 (explaining that

21

1  first generation cables that were in Masimo's inventory after December

2  28, 2004 were reworked, not shipped to customers). Nellcor was unable

3  to rebut this evidence, or to make any affirmative showing that

4  Masimo's first generation cables were made or sold after December 22,

5  1998. *See*, *e.g.*, Corenman Cross 1644:11-1645:24 (admitting that he did

6  not know the time period during which the first generation cables were

7  sold). Nellcor consequently failed to meet its burden to show that

8  Masimo's first generation cables infringed the '000 patent, thus a

9  reasonable jury could have easily found that these first generation

10 cables did not infringe the '000 patent.

11        **2.   Second Generation Cables**

12        In addition, a reasonable jury could have also found that Nellcor

13 failed to prove infringement by Masimo's second generation cable

14 design.  Specifically at issue was whether Masimo's second generation

15 design contained the "means for releasably connecting" limitation of

16 claim 18 of the '000 patent. Masimo proffered expert testimony that

17 the second generation cable does not have the "means for releasably

18 connecting" element, as defined by this Court. Pologe Direct 2130:7-

19 23. Mr. Pologe recognized that this Court's construction allows for

20 the bridge to be replaced by a spring action clip; nonetheless, Pologe

21 testified that Masimo's second generation cable does not infringe

22 because the connectors neither have "a means for releasably

23 connecting" nor an "equivalent" of a spring action clip. *See id.*

24 (testifying that "[t]his is unique language because it's been

25 construed by the Court to have a specific meaning.  And given that

26 specific meaning, I am testifying that the Masimo connectors do not

27 have that means for releasably connecting" and that "the Masimo

28 product doesn't function the same way, and it doesn't create the same

1  result, and therefore it is not equivalent"). A reasonable jury may

2  have accepted Pologe's testimony, and found that Nellcor failed to

3  carry its burden to show infringement.

4      There is substantial evidence to support the jury's conclusion

5  that Nellcor failed to demonstrate that Masimo's first generation

6  cables were made, used or sold during the '000 patent term. There is

7  also evidence sufficient to support the jury's conclusion that

8  Masimo's second generation cable does not contain a the "means for

9  releasably connecting" limitation as is required by the '000 patent

10  and this Court's claim construction. Consequently, this Court cannot

11  accept the argument that no reasonable jury could have concluded from

12  the evidence that Masimo's accused cables do not infringe Nellcor's

13  '000 patent.

14

15  **II.  WILLFUL INFRINGEMENT**

16      To obtain a judgment of willful infringement, a patent holder

17  must prove, by clear and convincing evidence, that the accused

18  infringer acted without reason to believe that its action avoided

19  infringement. *See State Contracting & Eng'g Corp. v. Condotte Am.*

20  *Inc.*, 346 F.3d 1057, 1063-64 (Fed. Cir. 2003). Willfulness is

21  determined by the totality of the circumstances. *See Gustafson, Inc.*

22  *v. Intersystems Indus. Prods. Inc.*, 897 F.2d 508, 510 (Fed. Cir.

23  1990).

24      To prove willful infringement, Masimo had to prove, by clear and

25  convincing evidence that 1) Nellcor was aware of the asserted patents,

26  and 2) that Nellcor proceeded with its infringing activities without a

27  good faith belief that the patents were either invalid, not infringed,

28  or both. Jury Instruction 18; *see also Gustafson*, 897 F.2d at 510.

23

Because Masimo did not present clear and convincing evidence from which a reasonable jury could conclude or even infer the existence of either of these factors, the Court grants Nellcor's motion for JMOL that any infringement of the '850, '830, or '222 patents by Nellcor was not willful.[15]

### A.   Notice

"[A] party cannot be found to have 'willfully' infringed a patent about which it had no knowledge." Gustafson, 897 F.2d at 510. Nellcor challenges the jury's verdict that Masimo's '850, '830, and '222 patents were willfully infringed on the basis that Masimo presented no evidence that Nellcor knew of the asserted claims prior to the suit being filed.

The '850, '830, and '222 patents issued in December 2000, March 2001, and July 2001, respectively, and were added to this case in July 2001. Thus the time between the asserted patents' issuance and filing date of this case ranged from seven months for the '850 patent to a single day for the '222 patent. Although Masimo presented no evidence that Nellcor had actual notice of Masimo's '850, '830, or '222 patents prior to this case being filed, Masimo argues that the jury could have inferred that Nellcor was aware of Masimo's patents. M.Opp:27-28; Re Argument to Court 2829:15-2830:22.

The evidence Masimo cites to support this inference falls far short of what any reasonable jury could consider clear and convincing evidence. None of the evidence Masimo cites as being evidence from

---

[15] Because the Court found that there was not substantial evidence to support the jury's verdict of infringement of the '785 patent, and because there cannot be willfulness if there is no infringement, the Court makes no ruling on whether, if there was infringement of the '785 patent, the evidence could support the jury's conclusion that infringement was willful.

1   which the jury could have inferred notice is from a time close to the

2   dates the '850, '830, or '222 patents issued. Masimo suggests that Tom

3   Yorkey researched Masimo and wrote a "Summary of Masimo's Patents" in

4   1993, that Ross Flewelling created a document about Masimo around

5   1996, that Nellcor announced in 1997 that Masimo had five patents and

6   others pending, and that Joe Kiani informed Nellcor in 1998 that

7   Masimo had patents that Nellcor might infringe if it developed similar

8   technology. M.Opp: 27-28 (referencing Yorkey Cross 1294:7-17; JTX

9   2428; JTX 2644; Flewelling Cross 1175:20-1176:16; Kiani Direct 336:10-

10  339:5). None of this evidence comes within two years of the dates that

11  the '850, '830, and '222 patents issued. None of this evidence even

12  suggests that Nellcor had a policy of monitoring Masimo's patents in

13  any systematic manner. While it is possible that the jury speculated

14  there was some process by which Nellcor learned of Masimo's patents,

15  and inferred from this speculation that Nellcor was aware of Masimo's

16  patents, speculation is insufficient to fulfill Masimo's burden of

17  proof, especially where, as here, the burden is a high one. *See*

18  *Spaulding v. United States*, 455 F.2d 222, 228 (9th Cir.

19  1972)(explaining that "speculation does not sustain the plaintiff's

20  burden of proof"). There is simply no evidence from which a reasonable

21  jury could find that Nellcor had notice of Masimo's patents before

22  suit was filed.

23      **B.   Good Faith**

24      Once Nellcor became aware of Masimo's patents, it had a duty to

25  act in good faith. There is no reasonable interpretation or inference

26  of Masimo's evidence of lack of good faith that would satisfy Masimo's

27  burden to prove this element by clear and convincing evidence.

28

### 1.   Advice of Counsel

Masimo argues that Nellcor's failure to seek the advice of counsel is evidence that Nellcor did not act in good faith. However, advice of counsel is not necessary to establish good faith, and this Court instructed the jury to that effect. Jury Instruction 18. Furthermore, Masimo has not established that Nellcor became aware of the '850, '830, or '222 patents until this litigation began, at which time they did get the advice of counsel - in preparing their defense.

Nellcor's defenses in this case were that these patents are not infringed, and that they are invalid and unenforceable. Although the jury ultimately rejected these defenses, it is impossible to conclude that they were frivolous. Particularly in light of Nellcor's success in the litigation regarding the closely related '642 patent, it could not have been unreasonable for Nellcor to believe that its defense would prevail.

Because Masimo did not proffer evidence from which a reasonable jury could have found that Nellcor had knowledge of the '850, '830, or '222 patents prior to this litigation, and because Nellcor obviously obtained assistance from counsel in preparing its defenses in this case, there was insufficient evidence to support the idea that Nellcor had some opportunity to obtain advice of counsel that it did not take.

### 2.   Copying

Masimo directs this Court's attention to two cases where willfulness was found to have existed even though the patent holders did not prove pre-suit notice of the patents. *See Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l*, 246 F.3d 1336 (Fed. Cir. 2001); *National Presto Indus. Inc. v. West Bend Co.*, 76 F.3d 1185 (Fed. Cir. 1996). In both of these cases, the accused

1  infringer had at least several months notice of the patents, and there

2  was also evidence of copying. *See Crystal*, 246, F.3d at 1343-44;

3  *National Presto*, 76 F.3d at 1193.

4       There is no evidence from which it would be reasonable to

5  conclude that there was copying in this case. Masimo's argument to the

6  contrary essentially rests on the testimony of one witness, its

7  founder Joe Kiani. M.Mot:32-33. In his testimony, Mr. Kiani describes

8  a number of meetings with Nellcor where he showed them Masimo's

9  technology. *See, e.g.*, Kiani Direct 289:4-292:15. Tellingly, Mr. Kiani

10 never says that he made technology disclosures to Nellcor. No evidence

11 was presented that Mr. Kiani or anyone at Masimo told Nellcor about

12 patented features such as Kalman filters, adaptive comb filters, and

13 alternative calculations. To reach a conclusion that there was copying

14 in this case, one would have to speculate from the mere fact that Mr.

15 Kiani met with Nellcor that he made confidential disclosures, and then

16 would have to further speculate that Nellcor copied these disclosures

17 and incorporated them into their products. There was no evidence to

18 support these conclusions, much less clear and convincing evidence.

19 Even rejecting Nellcor's contrary evidence and argument and drawing

20 all inferences in favor of Masimo, this web of thinly supported

21 speculation does not rise to the level of clear and convincing

22 evidence needed to support a finding of willfulness.

23      Masimo did not meet its burden in proving the willfulness case.

24 There was no evidence from which a reasonable jury could infer pre-

25 suit notice of the '850, '830, and '222 patents and there was even

26 less evidence of copying. Nellcor's motion for JMOL on willfulness is

27 granted.

28

III.    **VALIDITY**

Nellcor challenged the validity of each of Masimo's asserted patents on the grounds of anticipation, obviousness, inadequate written description, and lack of enablement. It was Nellcor's burden to prove invalidity by clear and convincing evidence. The jury found that Nellcor failed to meet this burden, and concluded that the challenged patents are valid. Verdict Form, Q.10-13. Nellcor challenges this verdict under 35 U.S.C. §112, and under §§102-03.[16]

A.    **§112: Patent Specification - Written Description and Enablement**

The written description requirement of 35 U.S.C. §112 calls for a specification that adequately describes each limitation of the claimed invention. *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998)(citing *Lockwood v. American Airlines*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)("While the meaning of terms, phrases, or diagrams in a disclosure is to be explained or interpreted from the vantage point of one skilled in the art, all the limitations must appear in the specification.")). The enablement requirement of §112 requires that the specification provide enough guidance to teach those skilled in the art how to make and use the claimed invention without "undue experimentation." *Genentech, Inc. v. Novo Nordisk*, 108 F.3d 1361, 1365 (Fed. Cir. 1997).

Nellcor presents two arguments for JMOL of invalidity under §112: (1) the argument that the Kalman claims are not adequately described

---

[16] Nellcor challenges the jury's verdict on written description and enablement (for each of Masimo's asserted patents), and anticipation (for the '222, '830, and '850 patents), but does not challenge the jury's conclusion that the inventions in Masimo's patents are not obvious.

1  and enabled and (2) the argument that the Court should have given the

2  '642 decision issue preclusive effect.[17]

3      1.    **Kalman Claims**

4          a.    <u>Written Description</u>

5      As is true of all of the claims Masimo asserted, the jury

6  determined that the Kalman filter claims in the '222 and '850 patents

7  were adequately described.[18] There are two potential bases upon which

8  the jury could have reached this verdict. First, they may have

9  accepted that those of skill in the art would understand the joint

10 process estimators described in the patent specifications to be

---

12     [17] Nellcor made an additional motion for JMOL of invalidity of
13 the '785 patent. In light of the Court's decision to grant JMOL that
   the '785 patent was not infringed, deciding invalidity of the '785
14 patent is unnecessary. However, there was sufficient evidence to
   support the jury's conclusion regarding the '785 patent.
15     Nellcor contends that there is no disclosure of how to select
   wavelengths to meet the linear relationship required by the '785
16 patent claims, and thus that this patent is not enabled. A reasonable
   jury could conclude that Nellcor failed to meet its burden to prove
17 that argument. The jury might have concluded, for example, that once
   one of skill in the art understood from the disclosure of the '785
18 patent that a linear relationship was desirable, choosing wavelengths
   necessary to create that relationship would not be complicated. Mr.
19 Corenman's testimony, which made selecting wavelengths appear to be a
   simple process, would have supported this conclusion. Corenman Direct
20 1463:4-1464:5. Even if this jury reached its conclusion for other
   reasons, Nellcor did not present evidence to prove that further
21 disclosure would be necessary once the disclosures in the '785 patent
   were understood. Thus, it was not unreasonable for the jury to
22 conclude that Nellcor failed to meet its burden to provide clear and
   convincing evidence that the '785 patent was invalid.

24     [18] Nellcor's motion actually protests the validity of the '785,
   '830, and '222 patents because of their alleged failure to adequately
25 describe Kalman filters, but neither the '785 nor the '830 patent
   contains Kalman claims. Because the '222 and '850 patents contain
26 Kalman claims, and because these are the patents discussed in the
   latter part of Nellcor's argument on this subject, the Court assumes
27 that it is actually the '222 and '850 patents' Kalman claims that
28 Nellcor argues are invalid. *See* N.Mot:44-45.

1   mathematically equivalent to the Kalman filters in the claims.

2   Alternately, the jury may have found that the Kalman claims were

3   adequately described because the patents list "Kalman filters" as one

4   of a number of correlation cancellation techniques that "may be used

5   together with the reference signals of the present invention" as an

6   alternative to joint process estimation. JTX 3541 col. 49:35-41.

7        The latter alternative (that the jury found Kalman filters to be

8   a correlation cancellation technique that, when used with a reference

9   signal, could be an alternative to joint process estimation) could not

10  - consistent with the jury's infringement verdict - have been the

11  basis for the jury's conclusion. If this was the theory under which

12  the jury found that there was adequate written description, then the

13  jury could only have found infringement if Nellcor's products

14  contained correlation cancellers with reference signals or the

15  equivalent thereto. There is no evidence in the record from which a

16  reasonable jury could have reached that conclusion.

17       The remaining theory under which the jury could have found

18  adequate description (that those of skill in the art would understand

19  joint process estimators to be mathematically equivalent to Kalman

20  filters) is consistent with the infringement verdict, and it is

21  supported by evidence in the record. Nellcor contends that only two

22  types of filters are disclosed in the '060 application that matured

23  into the '850 and '222 patents: a least mean squares adaptive filter

24  and a least squares lattice joint process estimator. N.Mot:44 (citing

25  Corenman Redirect 1903:2-7). Nellcor argues that although a least

26  squares lattice filter can be derived from a Kalman filter, neither a

27  least means squares filter nor a least squares lattice joint process

28

30

1  estimator can be derived from a Kalman filter. N.Mot:45 (citing

2  Corenman Redirect 1910:10-1912:21).[19]

3      Masimo's witnesses disagree. *See* Kiani Direct 279:15-16 (using

4  the terms "least squared lattice" [sic] and "Kalman filter"

5  interchangeably); Diab Cross 663:23-667:19 (describing mathematical

6  equivalence between the "recursive least square filter" and a "Kalman

7  filter"); Goldberg Direct 2396:12-2398:3 (explaining that the least

8  squares lattice joint process estimator depicted in Figure 8 of the

9  '222 and '850 patents is a type of Kalman filter), Goldberg Direct

10  2399:9-2405:20 (explaining that a textbook cited in the patents

11  demonstrates the correspondence between least squares lattice and

12  Kalman filters and thus that those of skill in the art would have

13  understood the correspondence); *see also* JXT 1817 (Haykin text on

14  adaptive filter theory).

15      Relying upon the testimony of these witnesses and the exhibits

16  upon which they relied, a reasonable jury could have concluded that

17  least mean squares filters and least squares lattice joint process

18  estimator filters are mathematically equivalent to Kalman filters, and

19  that one of skill in the art would have understood the description of

20  these filters in the '060 application to be equivalent to the Kalman

21  filter in the claims.

22              b.    Enablement

23      "[T]o be enabling, the specification of the patent must teach

24  those skilled in the art how to make and use the full scope of the

25  ───────────────────────

26      [19] Nellcor also cites *Masimo I* for the proposition that the
    specifications of the '222 and '850 patents disclose only adaptive

27  noise cancellers, not the full scope of filters in the claims.
    N.Mot:44-45. This Court has previously ruled, more than once, that

28  *Masimo I* does not have issue preclusive effect on this case. *See*,
    *e.g.*, Claim Construction Order (2/27/03).

1   claimed invention without 'undue experimentation.'"   *Genentech*, 108

2   F.3d at 1365 (quoting *In re Wright*, 999 F.2d 1557, 1561 (Fed. Cir.

3   1993)). Nellcor argues that none of the patents enable a Kalman filter

4   because they describe neither how a Kalman filter could be

5   implemented, nor how a "correlation cancellation technique" using the

6   "reference signals of the present invention" might work. N.Mot:45.

7   Nellcor cites to Dr. Friedlander's testimony that implementing a

8   Kalman filter would require extensive information not suggested in

9   Masimo's patents, and notes that Dr. Goldberg's conclusory statement

10  to the contrary does little to explain how the patents enable

11  implementation of Kalman filters. N.Mot:45 (citing Stone Redirect

12  1900:24-1901:20, Stone Redirect 1916:5-1921:17; JTX 9B ('364 patent

13  discussed in Stone's examination); Goldberg Direct 2398:4-19).

14       There is perhaps an argument to be made that the Kalman claims

15  are not adequately enabled, i.e. that the descriptions of least mean

16  squares filters and joint process estimators do not enable claims to

17  Kalman filters, but this is not the argument Nellcor makes. Instead,

18  Nellcor's contentions assume that the Kalman claims require a

19  correlation canceller. Because, as is previously discussed, the jury

20  could reasonably have concluded that the Kalman claims were adequately

21  described without limiting the Kalman claims to correlation

22  cancellers, Nellcor's enablement argument fails.

23            **2.   Inconsistency with '642 Decision**

24       Nellcor argues that the jury's verdict is inconsistent with

25  *Masimo I* and that *Masimo I* has issue preclusive effect. N.Mot:46. This

26  Court has rejected the argument that it should apply collateral

27  estoppel on several prior occasions, and does so yet again for the

28  reasons stated in this Court's previous Orders.

1    **B.    Anticipation**[20]

2        **1.    '850 Patent: Alternative Calculation Claims**

3            **a.    O4 Algorithm**

4        Nellcor argues that each of the asserted claims of the '850

5    patent is invalid under 35 U.S.C. §102(g) because they are anticipated

6    by Nellcor's O4 algorithm. N.Mot:46-47. However, the jury was free to

7    reject Nellcor's evidence that arbitration was introduced into

8    Nellcor's O4 algorithm in 1993. And even if the jury did not reject

9    this evidence, Masimo introduced evidence that Mr. Diab conceived of

10   the alternative calculation claims by the fall of 1991. Interrogatory

11   (read into the record) 1779:24-1780:4; JTX 1146; JTX 1147. Masimo also

12   presented evidence that the alternative calculation claims were

13   reduced to practice by January 18, 1993. Diab Direct 646:14-647:7

14   (explaining the date logs on software code, including version 140);

15   JTX 1430 (showing January 18, 1993 as the latest date of modification

16   on software version 140). In light of this evidence, a reasonable jury

17   could have concluded that Nellcor failed to meet its burden to prove

18   that Nellcor's O4 algorithm is prior art to the alternative

19   calculation claims in the '850 patent. Nellcor's motion for judgment

20   as a matter of law that Nellcor's O4 algorithm anticipates the

21   asserted claims of Masimo's '850 patent is <u>denied</u>.

22            **b.    PCSat Software Code**

23        Nellcor also argues that even if Masimo were able to prove

24   invention prior to the O4 algorithm, the PCSat software code is

25

26

27   _____

28        [20] Nellcor does not challenge the jury's verdict that the '785
     patent is not anticipated.

1  anticipating prior art under 35 U.S.C. §102(g).[21] Nellcor relies on Mr.

2  Baker's testimony that he used alternative calculations in PCSat in

3  1991. Baker Direct 1743:3-1747:12; 1755:24-1756:19. However, Mr. Baker

4  testified that the PCSat software was not used commercially or

5  disclosed outside of Nellcor. Baker Cross 1769:17-1770:10. On the

6  basis of this testimony, a reasonable jury could have concluded that

7  any alternative calculations that were in the PCSat research project

8  were abandoned, suppressed, or concealed.

9      Nellcor argues that PCSat was incorporated into the O4 algorithm,

10  and therefore was not abandoned, suppressed or concealed. Masimo

11  introduced contrary evidence that suggested that the O4 did not

12  incorporate the PCSat software. JTX 1007A, NC15186 (describing PCSat

13  as "spaghetti code [that] was not developed further or used directly

14  in the development of the O4 code"); Baker Cross 1768:6-16 (suggesting

15  that only the "concepts" of PCSat were carried forward); Goldberg

16  Direct, 2380:2-2384:23 (stating that not even the concepts of the

17  PCSat were carried forward into the O4 algorithm). A reasonable jury

18  could have accepted Masimo's evidence and concluded that Nellcor had

19  not proved that PCSat was prior art to Masimo's alternative

20  calculation claims.

21      Additionally, Masimo presented evidence that PCSat code was not

22  sufficient to anticipate the claims of the '850 patent. Goldberg

23  Direct 2379:6-2380:22, 2388:4-2393:6. Thus, even if the jury believed

24  that PCSat was prior art to the invention claimed in the '850 patent,

---

26  [21] In passing, and without citing any evidence, Nellcor suggests
in part of a sentence that in addition to the PCSat code, the N-200
27  anticipating prior art to the '850 patent. N.Mot:48, ll.14. As even
Nellcor is apparently unable to cite evidence or make an argument that
28  the N-200 utilized the alternative calculations claimed in the '850
patent, this suggestion is unpersuasive.

1  the jury could have accepted the testimony of Masimo's expert and

2  concluded that the PCSat did not anticipate the '850 patent. This

3  Court cannot find that no reasonable jury could have drawn this

4  conclusion, so Nellcor's motion for judgment as a matter of law that

5  the PCSat code anticipates the asserted claims of the '850 patent is

6  <u>denied</u>.

7                    c.    N-200

8       Nellcor argues that the asserted claims of the '850 patent are

9  anticipated by the N-200 in violation of 35 U.S.C. §102(b). According

10 to Nellcor, the N-200 meets each limitation of claims 1, 11, 12, 15,

11 and 22 of the '850 patent and was on sale as early as 1986. N.Mot:51-

12 52 (citing Stone Direct 1847:9-1850:17). Masimo presented evidence

13 that whereas the N-200 determines the heart rate from the ECG signal

14 and the IR signal and chooses which of those signals to display, the

15 invention in the '850 patent requires alternative calculations of the

16 same signal, and arbitration between the calculations, rather than

17 between signals. *See* Goldberg Direct 2361:6-2368:18, 2389:1-2393:6.

18      A reasonable jury could have rejected the testimony of Nellcor's

19 expert and accepted the testimony of Masimo's experts, particularly in

20 light of the fact that the Patent Examiner reviewed the N-200 patents

21 and concluded that they were not invalidating. Corenman Cross 1688:11-

22 1692:17 (testifying that Nellcor has patents claiming various

23 components of the N-200); Stone Cross 1874:25-1877:2 (admitting that

24 the '642 patent refers to the N-200 and was considered by the '850

25 patent examiner); Goldberg Direct 2327:12-2331:18 (stating that the

26 patent examiner had and considered prior art patents, including those

27 claiming components of the N-200 and that the prosecution history

28 contains no record that the examiner was concerned that the adaptive

SCANNED

1 filter claims were anticipated); JTX 213 FH1854-1857(listing
2 references the examiner considered in the '850 file history); JTX
3 540('167 patent referenced in Goldberg's testimony); JTX 3231('254
4 patent referenced in Goldberg's testimony). Consequently, Nellcor's
5 motion for JMOL that the N-200 is invalidating prior art under §102(b)
6 is denied.

        2.   '222 Patent: Kalman, Motion Claims, and Adaptive Filter
             Claims
             a.   O4: Kalman Claims

9       Nellcor argues that its O4 algorithm anticipates the Kalman
10 claims in the '222 patent, thus invalidating the '222 patent under 35
11 U.S.C. §102(g). N.Mot:48-49 (citing Friedlander Direct 1922:22-1924:20
12 (opining that Nellcor utilized Kalman filters in oximetry prior to
13 Masimo's claimed invention); Yorkey Direct 1186:24-1212:9, 1217:7-
14 1218:13, 1224:10-1227:7 (testifying that he utilized Kalman filters
15 for Nellcor by October 1993); JTX 2062, NC15274 (presentation outline
16 including reference to Kalman filter); JTX 2721, NC16285 (Yorkey's log
17 book including notes entitled "Kalman filter for SAT"); JTX 1135
18 (Yorkey 8/11/04 summary of O4 technology, including references to
19 Kalman filters), JTX 1007A (Baker 9/30/94 report on O4 technology,
20 including reference to Kalman filters); JTX 1510 (Yorkey 10-24-93
21 document describing the O4 as including Kalman filters). Nellcor
22 argues that Kalman filters were used in its O4 algorithm by the summer
23 of 1993, prior to the October 1993 application in which Masimo first
24 mentions the use of Kalman filters. N.Mot:49.

25      However, Masimo presented evidence that the O4 algorithm is not
26 prior art to Masimo's invention. Masimo contends that it had conceived
27 of the use of Kalman filters by the summer of 1990. Kiani Direct
28 277:19-280:10 (testifying as to conception in 1990); Diab Direct

630:13-641:16 (same); Interrogatory (read into record) 1778:7-1782:11; JTX 1100 (Diab lab notebook); JTX 1121 (same); JTX 1108 (software program dated 1990); JTX 1109 (software program dated 1990-91); JTX 1420 (software directory); JTX 3601 (same). Masimo argues that it had reduced the use of Kalman filters to practice by March 1991, when the '060 application was filed, and presented evidence that the Kalman filter claims in the '222 patent were disclosed and enabled by the '060 application. M.Opp:46 (citing Goldberg Direct 2395:10-2405:16; JTX 1817(Haykin text); JTX 1818 (same)). Nellcor counters that the '060 application does not disclose or enable Kalman filters, but this argument relies upon this Court applying the *Masimo I* decision to this case, which this Court has declined to do.

A reasonable jury could have accepted Masimo's evidence that it invented the use of Kalman filters in 1990 and reduced the invention to practice in 1991, well in advance of Nellcor's claimed 1993 invention date. If the O4 algorithm was not prior art it could not be invalidating. The jury may have accepted Masimo's evidence that the O4 algorithm was not prior art to the '222 patent and rejected the contrary evidence presented by Nellcor. As there was evidence to support the jury's conclusion, this Court cannot find that it was unreasonable. Thus Nellcor's motion for JMOL that its O4 algorithm anticipates the Kalman claims in the '222 patent is denied.

### b.   N-200

#### 1)   *Claims 17 and 18*

Nellcor contends that claims 17 and 18 are invalid under §102 because they are anticipated by the N-200. N.Mot:49-50. Nellcor bases this argument on the contention that "handling motion" is the sole point of novelty of these claims. N.Mot:49. Masimo presented evidence

1 that the N-200 did not "handle motion" as motion is defined in this

2 Court's claim construction. This Court defined "motion" as "movement

3 of body tissue which causes erratic noise that, in the absence of a

4 filter, will cause the ratio of red to infrared signals to not

5 accurately reflect the arterial oxygen saturation." Claim Construction

6 Order. Masimo presented evidence that the N-200 gave readings during

7 motion that did not "accurately reflect the arterial oxygen

8 saturation." Kiani Direct 267:20-270:11 (describing using the N-200 to

9 demonstrate the motion artifact problem), 357 (testifying that the N-

10 200 did not work through motion); Kiani Cross 409:4-15 (testifying

11 that the N-200 gave false alarms during motion, and thus was

12 unreliable); Sims Direct 487:18-490:18 (describing the problem of

13 false alarms during motion in general care units using the N-200);

14 Barker Direct 551:20-552:18, 577:8-20 (testifying that the N-200 was

15 unreliable during patient motion); Goldstein Direct 2215:2-2217:7

16 (describing noise problems with the N-200 in a neonatal intensive care

17 unit). This evidence provides a basis from which a reasonable jury

18 could have concluded that Nellcor did not meet its burden to show

19 clear and convincing evidence that the N-200 anticipated claims 17 and

20 18 of the '222 patent. Nellcor's motion for judgment as a matter of

21 law that the N-200 invalidates claims 17 and 18 of the '222 patent is

22 <u>denied</u>.

23                    *2)    Claims 21 and 22*

24      Based on the contention that the point of novelty of claims 21

25 and 22 of the '222 patent is the use of adaptive filters, Nellcor

26 argues that the N-200 anticipates these claims. Nellcor argues that

27 Masimo's expert's testimony that the N-200's filters were "adjustable,

28 not adaptive" because they did not improve their performance using

38

1  "closed loop action" did not reflect any limitation actually present

2  in the claims. N.Mot:50 (citing Friedlander Direct 2459:5-23

3  (testifying that there is no distinction between adjustable and

4  adaptive filters), Goldberg Direct 2316:10-2320:21 (opining that prior

5  art filters were adjustable, not adaptive). Nellcor cites to evidence

6  that pulse qualification in the N-200 utilizes closed loop action to

7  adapt to parameters. N.Mot:50 (citing Friedlander Redirect 2000:11-

8  2001:15).

9      A reasonable jury could have rejected this testimony and accepted

10  that of Masimo's experts, who testified that none of the filters in

11  the N-200 is "adaptive" as required by the claims. Goldberg Direct

12  2317:1-2320:12 (defining adaptive filters), 2331:19-2338:2 (testifying

13  that filters described in the prior art were not adaptive), 2441:2-

14  2443:4 (opining that the '222 patent claims adaptive filters);

15  Flewelling Cross 1164:8-1173:23, JTX 2640 (1992 Nellcor document

16  listing adaptive filters as a potential area for new technology

17  development); JTX 2415 (Flewelling presentation on oximetry technology

18  development); see also Friedlander Cross 1981:5-1984:16; JTX 2062.

19      Particularly in light of the fact that the Patent Examiner

20  determined that claims 21 and 22 were patentable over the N-200

21  patents and references, this Court cannot find that no reasonable jury

22  could reach the same conclusion. See Goldberg Direct 2331:6-18

23  (testifying that the patent examiner saw prior art patents and

24  evidently determined that they do not claim adaptive filters).

25  Nellcor's motion for JMOL that claims 21 and 22 of the '222 patent are

26  anticipated by the N-200 is <u>denied</u>.

27

28

1                    c.    PCT application

2        Nellcor argues that Masimo should receive a 1993 priority date

3  for the '222 patent, not the 1991 date it claims, and that Masimo's

4  PCT publication, which was published in September 1992, is therefore

5  invalidating prior art. N.Mot:51. This basis for JMOL was not raised

6  in the motions for JMOL that Nellcor made during trial, and was not

7  included in Nellcor's renewed motion. *See, e.g.*, Nellcor's Motion for

8  Judgment as a Matter of Law (filed March 10, 2004); Nellcor's Renewed

9  Motion for Judgment as a Matter of Law, or For a New Trial (filed

10 04/15/04)("N.Renewed"). Nellcor has consequently waived this argument.

11 FRCP Rule 50 (specifying that motions for JMOL on an issue must be

12 made "at any time *before* submission of the case to the jury")(emphasis

13 added).

14       Nellcor has not demonstrated that the evidence was such that no

15 reasonable jury could have found that the '222 patent was not

16 anticipated. There was evidence from which the jury could reasonably

17 have rejected Nellcor's validity challenge, and thus there is no basis

18 for this Court to grant JMOL that the '222 patent was anticipated.

19            **3.    '830: Adjustable Filter Claims**

20       Nellcor challenges the jury's validity finding regarding the '830

21 patent on the basis that the "use of filters where the filter transfer

22 function is adjusted" is the sole point of novelty in these '830

23 claims. Nellcor contends that the N-200 meets the limitations of the

24 asserted claims of the '830 and consequently anticipates those claims.

25 This argument is the same as that made with regard to claims 21 and 22

26 of the '222 patent, discussed above, and is rejected for the same

27 reasons. Nellcor's motion for JMOL that the N-200 anticipates the

28 asserted claims of the '830 patent is consequently denied.

                                   40

1      **C.**    **Obviousness**

2      In one sentence at the end of a section on anticipation of claims

3 21 and 22 of the '222 patent, Nellcor notes that "[a]daptive filters

4 would have been obvious in light of their prior use in physiological

5 monitors, such as fetal heart rate monitors." N.Mot.:50 (citing 444:6-

6 47:20 (admitting that adaptive filters had previously been used in

7 fetal heart monitoring); JTX 278, p.329 (book describing use of

8 adaptive noise cancelling in electrocardiography). However, it was

9 Nellcor's burden to prove obviousness by clear and convincing

10 evidence. A reasonable jury could have concluded that Nellcor's

11 evidence regarding fetal heart rate monitors failed to fulfill this

12 burden. Nellcor's motion for JMOL that the use of adaptive filters in

13 oximeters was obvious is <u>denied</u>.

14

15 **IV. DAMAGES**

16      Nellcor argues that it is entitled to JMOL that Masimo should not

17 receive damages for lost profits. N.Mot:69-73. To receive lost profits

18 as actual damages, Masimo must demonstrate, by a preponderance of the

19 evidence, that but for the infringement it would have made Nellcor's

20 sales. *State Industries, Inc. v. Mor-Flo Industries, Inc.*, 883 F.2d

21 1573, 1577 (Fed. Cir. 1989). Masimo relied on the four-factor *Panduit*

22 test to support its lost profits claim; only one of these factors is

23 currently in dispute. *See Panduit Corp. v. Stahlin Bros. Fibre Works*,

24 575 F.2d 1152, 1156 (6th Cir. 1978); *State Industries*, 883 F.2d at

25 1577 (discussing the Federal Circuit's acceptance of the Panduit

26 test). Nellcor argues that Masimo failed to present sufficient

27 evidence to support one of the factors of the Panduit test: the

28 absence of non-infringing substitutes. N.Mot:69-73.

1     Two categories of potential substitutes were discussed at trial:

2 "conventional" oximeters and "next generation" oximeters. Masimo

3 presented evidence that while conventional oximeters were non-

4 infringing, they were not acceptable substitutes because they did not

5 have the motion tolerant features for which customers specifically

6 chose both Masimo's oximeters and Nellcor's infringing oximeters. With

7 regard to "next generation" oximeters, Masimo presented evidence that

8 consumers would not consider them acceptable substitutes, and that if

9 they were acceptable substitutes they also likely infringed Masimo's

10 patents.

11     The jury apparently accepted this evidence. During trial, they

12 were instructed:

13         In determining whether Masimo lost sales due to
        infringement, you must consider whether or not, if

14         Nellcor's infringing products or methods were not
        available, some or all of the people who bought

15         from Nellcor would have bought a different, non-
        infringing product from Nellcor or from somebody

16         else, rather than buy from Masimo.

17         In deciding whether or not people who bought from
        Nellcor would have bought a non-infringing

18         product, you should consider whether or not there
        was a demand for the patented aspects of the

19         infringing product so that purchasers would not
        have bought a non-infringing product.

20 Jury Instruction 55. Applying this standard to the evidence presented,

21 the jury concluded that Masimo had proved, by a preponderance of the

22 evidence, that Masimo had demonstrated lost profits from lost sales.

23 To reach this conclusion, the jury must have determined that for 80%

24 of Nellcor's infringing sales there was no non-infringing alternative

25 to Masimo to which customers would have turned.

26     Although lost profits must be proved and not speculative "the

27 patent holder does not need to negate all possibilities that a

28

1 purchaser might have bought a different product or might have foregone

2 the purchase altogether." *State Industries*, 883 F.2d at 1577.

3 Nellcor's contention to the contrary suggests a misunderstanding of

4 what the *Panduit* test represents. *Panduit* is simply one way of

5 reconstructing the market as it would have been but for the

6 infringement. *See Grain Processing Corp. v. American Maize-Products*

7 *Co.*, 185 F.3d 1341, 1350-51 (Fed. Cir. 1999)(describing reconstructing

8 the market for lost profits analysis). The requirement that there be

9 an absence of acceptable non-infringing substitutes is an expression

10 of the idea that to receive compensation for all infringing sales, the

11 patent holder must prove that none of those sales would have gone

12 elsewhere in the but-for world. *See State Industries*, 883 F.3d at 1577

13 (describing the *Panduit* test as one standard for calculating lost

14 profits).

15    In this case, Masimo does not seek lost profits for all of the

16 infringing sales.  By seeking lost profits for 80% of Nellcor's

17 infringing sales, rather than for all of the infringing sales, Masimo

18 took account of the possibility that Nellcor's customers might have

19 bought a different product or might have foregone the purchase had

20 Nellcor's infringing products been unavailable. Because it does not

21 seek lost profits for 100% of the sales, Masimo need not demonstrate

22 the complete absence of acceptable non-infringing alternatives.

23    Masimo must, however, support its theory that 80% of Nellcor's

24 infringing sales would have gone to Masimo. This requires Masimo to

25 prove that for 80% of Nellcor's infringing sales, the customers would

26 not have found conventional oximeters acceptable substitutes and that

27 next-generation oximeters from third party companies would have either

28 been unacceptable or infringing. Masimo presented evidence to this

1  effect, and this Court cannot say that no reasonable jury could have

2  accepted that evidence.

3       It was not necessary for Masimo to prove a complete absence of

4  non-infringing alternatives, and Masimo offered evidence to support

5  its contention that for 80% of Nellcor's sales there would have been

6  no non-infringing alternative to Masimo's products. Consequently,

7  Nellcor's motion for judgment as a matter of law that Masimo cannot

8  receive damages for lost profits is <u>denied</u>.

9

10                        - BENCH TRIAL -

11      At the pretrial conference on January 21, 2004, this Court

12 determined that Nellcor's equitable defenses of indefiniteness and

13 unenforceability would be presented to the Court, not the jury.

14 Following the conclusion of the damages phase of the trial, the Court

15 heard evidence on the equitable defenses on March 24 and 25, 2004.

16

17 I.    INDEFINITENESS

18      Each of the asserted claims of the '222 patent contains a

19 "motion" limitation. Nellcor argues that the claims of the '222 patent

20 are indefinite because they do not distinguish the motion tolerance of

21 the claimed invention from the tolerance available the prior art and

22 because they fail to clearly define "motion" and "without significant

23 interference." N.Mot:7.

24      The ability to tolerate "motion", "without significant

25 interference" to the saturation calculation is a key feature of the

26 '222 patent. Claims 1 and 4 require the determination of saturation

27 "during motion." '222 patent, col. 73. Claim 16 requires the

28 determination of saturation "in the presence of motion induced noise."

1  '222 patent, col. 74. Claims 17-18 and 21-23 require the calculation

2  of saturation "without significant interference in the calculation

3  from the motion induced noise portion" of the signals. '222 patent,

4  col. 74-76. Claims 17 and 18 are of particular concern to Nellcor,

5  because the ability to tolerate "motion" is, at least according to

6  Nellcor, the only innovation in those claims. N.Mot:5.

7  **A.   Defining What is Claimed**

8      Claims must clearly delineate what the patent holder owns so that

9  the public is fairly apprised of what is not claimed. *See Festo Corp.*

10 *v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 730-31 (2002);

11 *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1217 (Fed. Cir.

12 1991).

13         **1.   Claim Construction**

14     "If a claim is subject to construction, i.e., it is not insolubly

15 ambiguous, it is not invalid for indefiniteness." *Bancorp Servs.*

16 *L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1372 (Fed. Cir.

17 2004). That this Court was able to construe the terms "motion" and

18 "without significant interference" in the '222 patent claims suggests

19 that these terms are not indefinite. Claim Construction Order (filed

20 2/27/03).

21             a.   Qualitative Definitions

22     The Court's constructions of "motion" and "without significant

23 interference" are qualitative, but this does not make them indefinite.

24 *See Bancorp Servs.*, 359 F.3d at 1372; *Exxon Research & Eng'g Co. v.*

25 *United States*, 265 F.3d 1371, 1381 (Fed. Cir. 2001).; *Modine Mfg. Co.*

26 *v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1557 (Fed. Cir.

27 1996). Qualitative definitions require "only a reasonable degree of

28 particularity and definiteness" to survive indefiniteness challenges.

1  *Exxon Research*, 265 F.3d at 1381. Thus, this Court's constructions

2  must be reasonably particular and definite for Masimo's '222 patent to

3  be valid.

1)   Motion

5       The Court defined "motion" as "movement of body tissue which

6  causes erratic noise that, in the absence of a filter, would cause the

7  ratio of red to infrared signals not to accurately reflect the

8  arterial oxygen saturation." Claim Construction Order: 16. Contrary to

9  Nellcor's assertion that this definition could apply to any motion,

10 all motion, or some undefined intermediate level of motion, the

11 Court's construction of "motion" places two clear limits on the term.

12 The construction clarifies that motion must cause "erratic" noise, and

13 that this noise must cause the ratio of red to infrared signals to not

14 "accurately reflect the arterial oxygen saturation." Because they

15 define the type and level of motion claimed in the patent, the Court's

16 constructions are reasonably particular and definite.

2)   *Without Significant Interference*

18      The Court's construction of  "without significant interference"

19 requires that "the calculated oxygen saturation is accurate enough for

20 the purposes for which the calculation is being employed." Claim

21 Construction Order: 16. Despite not being quantitative, this

22 construction is reasonably definite in that it indicates that, even in

23 the presence of motion, a saturation calculation must be useable for

24 its intended purpose for the claim language to be fulfilled.

b.   Skill in the Art

26      Indefiniteness is judged from the perspective of one of skill in

27 the art. If upon reading the claims in light of the specification one

28 of skill in the art would not understand the scope of the invention,

46

1  the claims are indefinite. *Miles Labs., Inc. v. Shandon, Inc.*, 997

2  F.2d 870, 875 (Fed. Cir. 1993). Both parties presented evidence during

3  trial that those skilled in the relevant field understood what was

4  meant by "motion." Even Mr. Corenman from Nellcor admitted that the

5  Court's construction of "motion" was "completely understandable."

6  Corenman Cross 4013:8-4014:21; *see also* Corenman Cross 4016:8-15

7  (opining that the '222 patent is indefinite, but admitting that the

8  Court's definition gives meaning to the word "motion"). Mr. Corenman

9  testified that the Court's construction defined a broad range of

10 motion, but could clearly pinpoint the low end of that range - i.e.

11 "wiggling [one's] finger a half an inch to an inch." Corenman Direct

12 1543:2-22. That even Nellcor's witness admitted his ability to

13 understand what was encompassed in the term "motion", as defined by

14 this Court, suggests that the term is not indefinite.

15  **B.    Distinguishing Close Prior Art**

16    To prevent uncertainty as to the scope of the claims, claims must

17 clearly distinguish close prior art. *United Carbon Co. v. Binney &*

18 *Smith Co.*, 317 U.S. 228, 236-37 (1942); *Amgen*, 927 F.2d at 1217-18

19 (finding that chemical compound claims reciting "about 160,000 IU/AU"

20 were indefinite, given prior art compounds using 128,620 IU/AU,

21 because it was unclear what value between 128,620 and 160,000 would

22 constitute infringement). Nellcor asserts that the N-200 is close

23 prior art, and that the '222 claims are indefinite for failure to

24 distinguish the N-200. N.Mot:8-9.

25    This indefiniteness argument is really a disguised invalidity

26 argument. Masimo's situation is not the same as that in *Amgen*, where

27 the disputed term, which was added to avoid prior art, potentially

28 recaptured the area that had been specifically rejected. 927 F.2d at

1  1217-18. In this case, however, the motion claims were not added to

2  avoid an invalidity challenge, and both the examiner and the jury

3  concluded that the '222 patent claims were distinguishable from and

4  thus patentable over the N-200. Nellcor has failed to prove either

5  that the N-200 is close prior art, or that the '222 claims are

6  indistinguishable from it. This indefiniteness argument, which is

7  really a disguised invalidity argument, consequently fails.

8      The Court finds that the claims of "motion" and "without

9  significant interference", as defined by this Court, are sufficiently

10  definite to give those of skill in the art notice as to what is

11  claimed by the '222 patent. Nellcor's indefiniteness defense is,

12  therefore, <u>denied</u>.

13

## II.  UNENFORCEABILITY

15      The regulations governing patent prosecution impose a duty of

16  candor and good faith on applicants:

17          Each individual associated with the filing and
            prosecution of a patent application has a duty of
18          candor and good faith in dealing with the [Patent]
            Office, which includes a duty to disclose to the
19          Office all information known to that individual to
            be material to patentability as defined in this
20          section.

21  37 C.F.R. §1.56. Nellcor argues that Masimo has breached this duty,

22  and that its '222, '830, and '850 patents are therefore unenforceable.

23  N.Mot:17-31. "Inequitable conduct rendering a patent unenforceable

24  arises when there is evidence of affirmative misrepresentation of

25  material fact, failure to disclose material information, or submission

26  of false material information, coupled with an intent to deceive."

27  *Ulead Systems, Inc. v. Lex Computer and Management Corp.*, 351 F.3d

28  1139, 1144 (Fed. Cir. 2003)(internal quotation omitted).

1   Inequitable conduct must be proved by clear and convincing

2 evidence. *Abbott Labs v. TorPharm, Inc.*, 300 F.3d 1367, 1379-80 (Fed.

3 Cir. 2002);  *Li Second Family Ltd P'ship v. Toshiba Corp.*, 231 F.3d

4 1373, 1378 (Fed. Cir. 2000). If this burden is met and inequitable

5 conduct is established, the patent is unenforceable. *Ulead Systems,*

6 *Inc.*, 351 F.3d at 1144; *Kingsdown Med. Consultants v. Hollister, Inc.*,

7 863 F.2d 867, 877 (Fed. Cir. 1988). Inequitable conduct with regard to

8 a single claim is sufficient to render the entire patent

9 unenforceable. *Kingsdown*, 863 F.3d at 877.

10   The first step in evaluating an inequitable conduct claim must be

11 to determine whether the party asserting inequitable conduct has

12 demonstrated materiality and intent. Materiality is defined in the

13 PTO's regulations:

14   Under this section, information is material to
   patentability when it is not cumulative to
15   information already of record or being made of
   record in the application, and 1) it establishes,
16   by itself, a prima facie case of unpatentability[22]
   of a claim; or 2) it refutes, or is inconsistent
17   with a position the applicant takes in i) opposing
   an argument of unpatentability relied on by the
18   Office, or ii) asserting an argument of
   patentability.

19

20

21

22

23

24

25   [22] "A prima facie case of unpatentability is established when the
   information compels a conclusion that a claim is unpatentable under
26   the preponderance of the evidence, burden-of-proof standard, giving
   each term in the claim its broadest reasonable construction consistent
27   with the specification, and before any consideration is given to
   evidence which may be submitted in an attempt to establish a contrary
28   conclusion of patentability." 37 C.F.R. §1.56.

1    37 C.F.R. §1.56(b).[23] Intent may be proved by circumstantial

2  evidence. *Critikon*, 120 F.3d at 1256 ("Direct evidence of intent or

3  proof of deliberate scheming is rarely available in instances of

4  inequitable conduct, but intent may be inferred from surrounding

5  circumstances."). If the applicant knew, or should have known, that

6  the PTO would consider withheld information to be material, intent may

7  be inferred. *Id.*

8    If threshold levels of materiality and intent are established,

9  the Court then must evaluate the applicant's conduct to determine

10 whether it constitutes inequitable conduct. *Dayco Prods., Inc. v.*

11 *Total Containment*, 329 F.3d 1358, 1363 (Fed. Cir. 2003) (noting that

12 the court must weigh "materiality and intent in light of all the

13 circumstances to determine whether the applicant's conduct is so

14 culpable that the patent should be held unenforceable"); *Semiconductor*

15 *Energy Lab Co. v. Samsung Elecs. Co.*, 204 F.3d 1368, 1373 (Fed. Cir.

16 2000)("In light of all the circumstances, an equitable judgment must

17 be made concerning whether the applicant's conduct is so culpable that

18 the patent should not be enforced.")

19    Nellcor presents two inequitable conduct arguments. First,

20 Nellcor asserts that Masimo committed inequitable conduct through its

21 failure to disclose documents and decisions related to the '642

22 litigation to the Patent and Trademark Office. Next, Nellcor argues

23 that Masimo committed inequitable conduct by saying in specifications

24

25    [23] Nellcor cites the pre-1992 standard for materiality, which
says that information is material if "there is a substantial
26 likelihood that a reasonable examiner would consider it important in
deciding whether to allow the application to issue as a patent."
27 N.Mot:23. As the events in question here occurred in the fall of 2000,
they are not judged by this standard. *See CFMT, Inc. and CFM*
28 *Technologies, Inc. v. Yieldup International Corp.*, 349 F.3d 1333, 1340
(Fed. Cir. 2003)(applying this standard to pre-1992 conduct).

1 │ that prior art oximeters were "totally inoperative" despite knowing

2 │ that the N-200 was operable during motion.

3 │ **A.   '642 Decision**

4 │      Although not a part of this case, the '642 patent has been

5 │ repeatedly discussed in this litigation because the '222, '830, and

6 │ '850 patents that are at issue in this case are related to Masimo's

7 │ '642 patent. The application that resulted in the '642 patent was a

8 │ continuation of the '060 application, which is also true of each of

9 │ the '222, '830 and '850 patents. The '830 application has an identical

10 │ specification to the '642 patent. Prior to the present litigation,

11 │ Masimo unsuccessfully accused Nellcor of infringing the '642 patent.

12 │ *Masimo I*.

13 │      In the '642 litigation the District Court construed Masimo's

14 │ claim language narrowly and granted summary judgment. *Masimo I*, JTX

15 │ 8510, *aff'd* JTX 8512. Nellcor contends that because the Court's

16 │ summary judgment decision in the '642 litigation preceded the issuance

17 │ of the '222, '830, and '850 patents, and because Masimo did not

18 │ disclose the Court's findings on the '642 litigation to the District

19 │ Court, Masimo's conduct was inequitable.

20 │      Although the Court finds that Nellcor has not established the

21 │ materiality of the *Masimo I* litigation to the prosecution of the '222

22 │ and '850 patents, the threshold showings of materiality and intent

23 │ were made with respect to the '830 patent. Masimo's conduct with

24 │ respect to the '830 patent was sufficiently culpable to justify

25 │ finding that inequitable conduct occurred and that the '830 patent is

26 │ unenforceable.

27 │

28 │

1         **1.   '830 Patent**

2        The '642 decision was relevant to the scope of the claim terms

3    "adaptive filter" and "adaptive signal processor." These same terms

4    were at issue in Masimo's prosecution of the '830 patent before the

5    PTO at the same time they were at issue in the '642 litigation.

6    Masimo's conduct in failing to disclose the '642 litigation or the

7    *Masimo I* decisions to the PTO during the prosecution of the '830

8    patent fulfills the requirements of threshold showings of materiality

9    and intent, and was so culpable that the balance of equities favors

10   holding the '830 patent unenforceable.

11              a.   Materiality

12       The key dispute in the *Masimo I* summary judgment hearings was

13   whether the terms "adaptive filter" and "adaptive signal processor" in

14   the '642 patent were limited to an "adaptive noise canceller." *Masimo*

15   *I* Transcript, JTX 8506, 6080:25-6081:3 (Masimo's statement), 6094:25-

16   6095:2 (Nellcor's statement). The Court concluded that the '642

17   specification, in light of the claims and prosecution history, only

18   supported a construction of "adaptive filter" that was limited to an

19   "adaptive noise canceller." *Masimo I*, JTX 8510, ¶71, *aff'd* JTX 8512

20   (Fed. Cir. 2001) ("The specification repeatedly teaches the use of an

21   adaptive noise canceller to remove noise from the input signals once

22   the noise reference signal is generated, and it does not point to any

23   other filter that performs a similar function").

24       The *Masimo I* Court's determination that "the term[s] 'adaptive

25   filter' . . . 'adaptive signal processor' . . . can only mean one

26   specific type of adaptive filter, an adaptive noise canceller" was

27   clearly important to the prosecution of the '830 patent. Masimo's

28   failure to disclose the *Masimo I* litigation was a failure to disclose

information highly material to the position Masimo took during prosecution that both "adaptive filter" and "adaptive noise canceller" claims were patentable.[24] The failure to disclose the '642 litigation therefore fulfills the regulatory definition of materiality.

The *Masimo I* dispute was highly relevant to the '830 patent because the '830 and '642 patents share a specification, and Masimo was pursuing an amendment before the PTO that would add to the '830 patent exactly those terms being disputed in the '642 litigation. At the time of the *Masimo I* summary judgment hearing and the Court's decision on it, Masimo was prosecuting what ultimately became claims 41, 43, 63 and 66 of the '830 patent. JTX 207. Independent claims 41 and 63 both include the term "adaptive filter." Dependent claims 43 and 66 further limit "adaptive filter" in claims 41 and 63 to "adaptive noise canceller," clarifying that Masimo intended "adaptive filter" in the '830 patent to not be limited to "adaptive noise canceller." Masimo was thus pursuing "adaptive filter" claims along with dependent claims to clarify that "adaptive filter" was to be broadly interpreted.

This position is directly contrary to the *Masimo I* Court's conclusion that the same specification, in light of the claims and prosecution history, required construing "adaptive filter" to be limited to an "adaptive noise canceller." Thus in amending the application that became the '830 patent to include the terms "adaptive

---

[24] Masimo argues that even if the '642 patent described only an adaptive noise canceller, this would not lead to the conclusion that broader claims would have been unpatentable. M.Opp:13, n.3. In this argument, Masimo misses the relevant consideration. The Court is not concerned with whether the '642 decision would have caused the examiner to reject the claims, but only whether it would have been *material* to the examiner's consideration of whether the claims were patentable.

1 filter" and "adaptive noise canceller", and in such a way as to

2 clarify that the former was not limited to the latter, Masimo advanced

3 a position before the PTO that was called into question by the summary

4 judgment proceedings in the '642 litigation. By not disclosing the

5 existence of the litigation, or the Court's rulings on the "adaptive

6 filter" issue, Masimo withheld material information from the PTO.

<u>b.</u>    <u>Intent</u>

8 In this case Masimo had reason to know that the '642 litigation

9 was material, the litigation and the patent prosecution were handled

10 by the same lawyer, and there is no good faith explanation for

11 Masimo's failure to disclose the litigation. These factors make it

12 possible to infer that Masimo withheld information about the '642

13 litigation with the intent to deceive the PTO.

*1) High Materiality*

15 As is discussed above, the '642 litigation was highly material to

16 prosecution of the '830 patent. That the litigation was very material

17 lowers the threshold of intent required to establish inequitable

18 conduct. *See Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,*

19 120 F.3d 1253, 1256 (Fed. Cir. 1997) ("The more material the omission

20 or misrepresentation, the lower the level of intent required to

21 establish inequitable conduct, and vice versa.") In this case,

22 however, intent could be inferred even if the threshold were not

23 lowered because Masimo knew, or at least should have known, of the

24 materiality of the information it chose not to disclose.

25 Masimo had reason to know that the *Masimo I* Court's decision was

26 material to the prosecution of the '830 patent. During the prosecution

27 of the '642 patent, the examiner initially rejected claims using the

28 terms "adaptive filter" as unsupported by the specification. *See* JTX

8510, ¶15. The examiner wanted to treat the term "adaptive filter" in
the '642 patent as being limited to an "adaptive noise canceller." JTX
8506, 6082:13-23.[25] Masimo convinced the examiner that "adaptive
filter" should not be limited to "adaptive noise canceller," thus the
'642 patent issued with "adaptive filter" in the claims.

Given this history, and that these same terms were at issue in
the '642 litigation, Masimo had reason to know that the litigation and
the Court's decisions on it would be material to Masimo's successful
attempt to amend the '830 patent to add "adaptive filter" claims along
with dependent claims to clarify that "adaptive filter" was to be
broadly interpreted.

That Masimo knew that the '642 examiner was concerned that the
specification supported only "adaptive noise canceller" and not
"adaptive filter" claims gave Masimo reason to know that the *Masimo I*
Court's decision essentially affirming the '642 examiner's concerns
would be material to whether those same terms were patentable in the
'830 patent, which contains the same specification. The Court can – an
does – infer intent from this evidence.

---

[25] In his statement opposing summary judgment in the '642 case,
Mr. Jensen explained:

> Now, more interestingly here, the patent office
> has already dealt with this issue expressly.
> During the prosecution the patent office,
> interestingly, demanded the very same rewrite that
> the defendants propose. And the examiner said,
> "I'm going to treat the term as an adaptive noise
> canceller." And Masimo insisted that it was
> entitled to the term "adaptive filter," and
> pointed the examiner to the places where that was
> supported in the specifications and ended its
> argument by saying, yes, it is entitled to the
> term "adaptive filter." That's what Masimo did.

JTX 8506:6082:13-23.

1                              *2) Patent and Litigation Counsel*

2        The principal attorney representing Masimo before the PTO was

3  also Masimo's litigation counsel. Jensen Direct 3837:2-10 (noting that

4  Jensen's representation of Masimo began in 1994), JTX 8506 (Jensen

5  arguing the summary judgment motion in the '642 case). It is

6  impossible to believe that the lawyer who argued for Masimo that

7  "adaptive filter" and "adaptive signal processor" should not be

8  limited to "adaptive noise canceller", who was at the same time

9  pursuing amendments to the '830 patent that would add "adaptive

10 filter" and "adaptive signal processor" claims and clarify that they

11 were not to be restricted to "adaptive noise cancellers" could not

12 have known that the former would be important to the latter.   The

13 *Masimo I* decision held that the specification that the '830 and '642

14 patents share did not support the claims Masimo was amending the '830

15 application to include.[26]   That Masimo was represented by the same

16 attorney in the '642 litigation and '830 prosecution makes it

17 undeniable that while Masimo continued prosecution of the '830 patent

18 Masimo was well aware of the materiality of the *Masimo I* Court's

19 decision. These circumstances are evidence from which intent may be

20 inferred.

21

22

23 _____

24      [26] Consistent with this Court's previous ruling that the '642
    patent does not have issue preclusive effect, it is notable that the
25  *Masimo I* Court ruled that the '642 specification, in light of the
    claims and prosecution history, only described "adaptive noise
26  canceller" and not "adaptive filter" claims. Although differences in
    the claims and prosecution history caused this Court to determine that
27  the '642 patent would not be given issue preclusive effect in this
    case, the fact that the specifications of the '642 and '830 patents
28  are identical is very relevant to the Court's determination that the
    '642 litigation was material to the prosecution of the '830 patent.

### 3) *Good Faith*

Masimo's attempt to demonstrate good faith was unconvincing.
Masimo argued that the protective order governing the '642 litigation
prohibited it from disclosing the litigation to the PTO. M.Opp:22.
However, Masimo's counsel testified that he understood that he could
have gone to the *Masimo I* Court and had material de-designated so that
it would no longer be covered in the protective order. Jensen Direct
3900:7-12. Masimo's counsel approached neither the Court nor Nellcor
about withdrawing any material from the protective order in the '642
litigation for the purposes of disclosing it during the prosecution of
the '830 patent. Jensen Direct 3900:7-20. Because Masimo made no
attempt to overcome the barrier to disclosure presented by the
protective order, this Court cannot find that it was more than a
convenient excuse not to disclose. Had Masimo sought and been denied
permission to disclose relevant information, the protective order
would likely constitute evidence of good faith. But Masimo neither
sought to withdraw material from the protective order, nor did it
alert the PTO to the existence of material that could not be disclosed
or even the fact that the litigation existed. The mere existence of
the protective order is insufficient to demonstrate Masimo's good
faith.

The Court recognizes that "even gross negligence does not alone
suffice to establish intent." *CFMT*, 349 F.3d at 1342; *see Ulead
Systems*, 351 F.3d at 1145(noting that the PTO's post-1992 rule removes
the gross negligence language of the original rule and replaces it
with references to "intent to deceive"). In this case, however, there
is substantial evidence from which intent – not merely negligence –
may be inferred. The '642 litigation was highly material to the '830

1    patent and, given both the prosecution history of the '642 patent and

2    the fact that the same lawyer represented Masimo in the '642

3    litigation and the '830 patent prosecution, there is ample evidence

4    from which it may be inferred that Masimo knew that the litigation was

5    material. Masimo has not offered convincing evidence of good faith.

6    Consequently, the evidence supports the inference that Masimo withheld

7    the '642 litigation and the *Masimo I* Court's decisions with the intent

8    to deceive the PTO. In light of all the evidence, Masimo's conduct

9    indicated "sufficient culpability to require a finding of intent to

10   deceive." *CFMT*, 349 F.3d at 1343.

11                  c.   Unenforceability

12        As Nellcor has established intent and materiality by clear and

13   convincing evidence, the Court must evaluate whether Masimo's conduct

14   rises to the level of inequitable conduct. Based on the clear

15   materiality of the '642 decision, the PTO's expressed interest in the

16   exact question being considered by the '642 litigation, the fact that

17   the '642 litigation and the '830 prosecution were happening at the

18   same time, the fact that the same lawyer controlled both the

19   litigation and the prosecution, as well as Masimo's failure to

20   demonstrate good faith, this Court finds that Masimo committed

21   inequitable conduct by neglecting to bring the '642 litigation to the

22   attention of the PTO. Because of Masimo's inequitable conduct, this

23   Court holds that the '830 patent is unenforceable.

24             2.   '222 Patent

25        Both the '642 patent that was at issue in Masimo I and the '222

26   patent at issue in this case stem from the '060 application. The

27   priority date for the '060 application is March 1991. Because the '222

28   patent relates back to this '060 application, Masimo's claimed

                              58

1   priority date for the Kalman claims in its '222 patent is also March

2   1991. Nellcor argues that the *Masimo I* decision determined that the

3   '060 application does not disclose Kalman filters, and thus that

4   Masimo cannot rely on the March 1991 priority date. Nellcor believes

5   that this inability to rely on the March 1991 date is material to

6   patentability because the next date on which Masimo could rely, the

7   October 1993 date of Masimo's continuation-in-part (CIP) application,

8   falls after the date that Nellcor contends it first began using Kalman

9   filters in the O4 algorithm.[27]

10      Nellcor has not offered clear and convincing evidence that the

11  *Masimo I* Court's decision was material to the priority date. If it

12  were true that the *Masimo I* Court held that the '642 specification

13  (which is the same as the '060 application) does not disclose Kalman

14  filters, Nellcor might have an argument that this decision is material

15  to establishing patentability of the Kalman claims. This is not,

16  however, what the Court ruled. The *Masimo I* Court does not examine the

17  '642 specification to determine whether a claim to Kalman filters

18  could be supported by that specification. The closest the Court comes

19

---

20      [27] Nellcor briefly mentions an alternate theory of inequitable
    conduct related to the '222 patent. The '222 patent describes an
21  adaptive noise canceller as an example of a correlation canceller and
    mentions a Kalman filter as another correlation cancellation
22  technique. JTX 3541 col. 1:18-21, col. 49:36-38. Nellcor argues that
    because the *Masimo I* Court concluded that the only filters disclosed
23  in the '642 specification were adaptive noise cancellers that receive
    noise reference signals, and because the applications that led to the
24  '222 and '642 decisions were similar, the *Masimo I* decision was
    material to the prosecution of the '222 patent. Nellcor's simple
25  assertion that because the applications were similar, the ruling on
    the '642 is relevant to the prosecution of the '222 patent does not
26  approach sufficient evidence to establish materiality. Nellcor does
    not even attempt to explain how the *Masimo I* ruling might have
27  affected patentability of the '222 claims, and certainly has not
28  presented clear and convincing evidence of materiality.

1  to making any ruling about what filters are or are not in the claims

2  is its determination that using filters that do not accept a noise

3  reference signal would be contrary to the teachings of the patent. JTX

4  8510, ¶51. The Court holds that the particular Kalman filters in

5  Nellcor's O4 algorithm do not infringe the limitations of the claims

6  that were asserted in the '642 litigation, but makes no determination

7  about whether Kalman filters generally are supported by the patent.

8  JTX 8510, ¶¶72-75. Nellcor has not demonstrated that this limited

9  ruling is material to whether the '060 application supports Kalman

10  filter claims.

11      Even if the *Masimo I* decision meant that Masimo could not claim

12  the 1991 priority date, this does not necessarily mean that the

13  earliest date Masimo could claim is the date of its October 6, 1993

14  CIP application. Nellcor has not demonstrated that Masimo could not

15  prove earlier conception, with either reduction to practice prior to

16  Nellcor's claimed invention date or diligent work until its reduction

17  to practice. Without this showing, Nellcor has not demonstrated that a

18  later priority date would be material to patentability.

19      Because Nellcor has not offered clear and convincing evidence

20  that the decisions and documents from the '642 litigation were

21  material to patentability of the '222 patent, the Court does not reach

22  the question of intent. Without a threshold showing of materiality,

23  Nellcor cannot sustain an equitable conduct claim.

24          **3.   '850**

25      Nellcor argues that the exhibits to the Yorkey and Baker

26  declarations that were submitted in the '642 litigation establish that

27  Nellcor implemented alternative calculations and arbitration in the O4

28  algorithm prior to filing date for Masimo's '850 claims, which was

1  October 7, 1994. However, to be relevant to patentability, Nellcor

2  would have to demonstrate that it implemented alternative calculations

3  and arbitration prior to Masimo's priority date, which is not

4  necessarily equivalent to Masimo's filing date.[28] Nellcor has not

5  demonstrated that anything in the Yorkey and Baker declarations was

6  material to patentability because it has not established that Masimo's

7  priority date was subsequent to the inventions Nellcor claims are

8  demonstrated by those declarations. Nellcor has consequently not met

9  its burden of proof regarding materiality. Because this threshold

10  element has not been proved, Nellcor's inequitable conduct claim must

11  fail.

12  **B.    N-200 Motion Tolerance**

13      Nellcor claims that Masimo intentionally withheld various

14  experiments showing the ability of the N-200 to read accurately during

15  motion. Nellcor attempts to substantiate this claim by taking quotes

16  from the '222 and '850 specifications out of context and arguing that

17  the allegedly withheld experiments were inconsistent with those

18  quotes. In addition to being misleading and wasteful of this Court's

19  time and resources, these misquotes are insufficient to establish

20  materiality.

21      Nellcor asserts that the '830 and '222 patent specifications

22  state that prior art oximeters were "totally inoperative" during

23  movement, and that the N-200 experiments were material to the PTO's

24  consideration of those statements. See N.Mot:30 (asserting that the

25  specification of the '830 patent claims that the previous monitors

26

27

_____

28      [28]   Masimo argues that it conceived of the alternative
calculation claims by the fall of 1991 and reduced them to practice by
January 1993. M.Opp:15-16.

1 were "totally inoperative during time periods when the patient moves"

2 and that the specification of the '222 patent claims that the

3 "presently available physiological monitors" were "totally

4 inoperative" when the "measurement site is perturbed").

5     Nellcor quotes only part of the specifications in question. The

6 actual language in Masimo's '830 specification reads:

> "Traditional signal filtering techniques are
> frequently totally ineffective and grossly
> deficient in removing these motion induced effects
> from a signal.  The erratic or unpredictable
> nature of motion induced undesired signal
> components is the major obstacle in removing them.
> Thus, presently available physiological monitors
> generally become totally inoperative during time
> periods when the patient moves."

12 '830 patent, JTX 3547, col. 2:37-45 (emphasis added); *see also* '222

13 patent, JTX 3541, col. 2:53-60 (using language identical to the '830

14 language quoted, except substituting "measurement site is perturbed"

15 for "the patient moves" in the final sentence).  In misquoting the

16 specifications, Nellcor creates the impression that Masimo's

17 specifications state, definitively, that the prior art never read

18 through motion – a statement that would be inconsistent with the

19 results of the withheld experiments.  However, the actual statements

20 in the specification are qualified. Nellcor has failed to demonstrate

21 how the allegedly withheld experiments are material to evaluating

22 these qualified statements.[29]

---

[29] In fact, the experiments appear to support these statements,
as qualified. At trial, Kiani testified that the "generally totally
inoperative" language in the specification means that "more often than
not, in fact the product would be inoperative." Kiani Direct 3967:9-
22. Studies have shown this to be true especially during movement;
even the study that Nellcor cites in support of its Motion indicates
that the N-200 falsely alarms in 36 out of 50 motion events.  JTX 3390
at Table 2 – "FP" line, Methods at 102-04.

1     Given the actual text of the specification and the evidence

2 presented at trial, Nellcor has not made a threshold showing of

3 materiality. In light of this lack of materiality, the Court does not

4 reach the question of intent. Masimo's failure to disclose certain

5 experiments as prior art has not been shown to be material to any of

6 the patents at issue. Thus it does not amount to inequitable conduct.

7

8                               **– NEW TRIAL –**

9     As an alternative to its motions for JMOL, Nellcor moves for a

10 new trial pursuant to FRCP 59(a) on all issues relating to both

11 liability and damages. Nellcor contends that a new trial is warranted

12 in this instance because (1) the jury verdict is against the clear

13 weight of the evidence, (2) there were several legal errors throughout

14 the case which prevented a fair trial, and (3) Masimo's counsel acted

15 in a manner that irreparably prejudiced the outcome and prevented a

16 fair trial on the merits. N.Mot: 53-69.[30]

17

18

19

20 _____

21     [30] In its renewed JMOL motion, Nellcor makes an additional
argument that does not appear in its memorandum in support of that
22 motion. Nellcor contends that if this Court concludes that Masimo
committed inequitable conduct, as is the case with the '830 patent, a
23 new trial must be granted because the damages award was based on
infringement of all four patents. N.Renewed: 14. This argument is
24 unconvincing because damages were based on sales of actual products,
and the same products containing elements the jury concluded infringed
25 the '830 patent were also found to infringe the '222 and '850 patents.
Had the '830 patent never been in this case, there is no reason to
26 believe that the jury's verdict or this Court's decision on the '222
and '850 patents would have been any different. Thus the same products
27 would have infringed, and the same damages would have been awarded.
This inequitable conduct argument does not provide a basis for
28 granting a new trial.

# I.   WEIGHT OF THE EVIDENCE

Nellcor seeks a new trial based on its assertion that the jury's liability verdict was against the clear weight of the evidence, and that the damages verdict was both against the weight of the evidence and excessive. A District Court may grant a new trial if "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 818-19 (9th Cir. 2001)(internal quotations omitted). "In order to find that a verdict was against the clear weight of the evidence, the court must more than simply disagree with the jury's decision." *Computer Access Tech. Corp. v. Catalyst Enters., Inc.*, 273 F. Supp. 2d 1063, 1065-66 (N.D. Cal. 2003).

Nellcor has not met its burden to prove that the jury reached a decision that is contrary to the clear weight of the evidence on either the liability or the damages issues.  While this Court may have found certain witnesses to be more credible and persuasive than those the jury relied upon, and as such may disagree with some of the ultimate conclusions of the jury, this Court does not find that the jury's decisions regarding liability or damages were either unsupported by the great weight of the evidence or excessive.

# II.   LEGAL ERROR

Nellcor argues that a new trial is justified because it claims that this Court has made several legal errors.[31] To grant a motion for

---

[31] Nellcor protests several rulings it believes were erroneous. These include the Court's Orders filed on 1/22/04, 2/19/04, 2/26/04,

1  a new trial based upon legal error, the moving party must show that it
2  was "substantially prejudiced" by the ruling and that there is a
3  significant chance the ruling affected the jury's verdict. *United*
4  *States v. 99.66 Acres of Land*, 970 F.2d 651, 658 (9th Cir. 1992). In
5  this case, however, the Court does not reach the question of whether
6  Nellcor was "substantially prejudiced" by any legal error because
7  Nellcor has not demonstrated that error existed. For reasons given in
8  the original rulings made by this Court both prior to and during
9  trial, this Court believes that its rulings were supported by the law
10 and within the Court's discretion.

11

12 **III.    PREJUDICIAL CONDUCT**

13      A new trial may be warranted on the grounds of attorney
14 misconduct during the trial "where the 'flavor of misconduct . . .
15 sufficiently permeates an entire proceeding to provide conviction that
16 the jury was influenced by passion and prejudice in reaching its
17 verdict.'"  *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69
18 F.3d 337, 346 (9th Cir. 1995) (citations omitted).

19      Nellcor has not demonstrated any conduct on the part of Masimo's
20 counsel that could not have been adequately countered through cross
21 examination. There has certainly been no showing of misleading
22 statements or actions that would be sufficient to demonstrate that the
23 jury's verdict was the result of passion or prejudice.

24

25

26 ────────────────

27 1/21/04, the Court's determination that insufficient evidence had been
   presented to support including the reverse doctrine of equivalents on
28 the verdict form, and the Court's decision to bifurcate damages from
   liability. *See* N.Mot:55-68.

1   Thus, the Court rejects each of the three bases Nellcor asserts

2 demonstrate the need for a new trial, and finds that a new trial is

3 not warranted. Nellcor's motion for a new trial is therefore <u>denied</u>.

4

5                          **– INJUNCTION –**

6   Masimo claims that, as a matter of law, it is entitled to an

7 injunction prohibiting Nellcor from "making, using, selling, offering

8 to sell or importing any product that includes the O4, O5, or O5CI

9 algorithms or any product employing an algorithm that is no more than

10 colorably different from the O4, O5, or O5CI algorithms" or from

11 supplying software embodying these algorithms to others. Proposed

12 Permanent Injunction ("Inj"), ¶2-3. Under Masimo's proposed

13 injunction, until the Federal Circuit issues its decision in any

14 appeal of this case Nellcor would be permitted to repair broken or

15 defective infringing products and to replace infringing products with

16 an identical model. Inj:¶4. Once any appeal has been resolved, Nellcor

17 would not be permitted to repair infringing products or replace them

18 with other infringing products. *Id.*

19   35 U.S.C. §283 provides that courts with jurisdiction over patent

20 cases "may grant injunctions in accordance with the principles of

21 equity to prevent the violation of any right secured by the patent, on

22 such terms as the court deems reasonable." As a general rule, when

23 infringement has been proved an injunction should be granted to

24 protect the patent holder's property right. *Richardson v. Suzuki Motor*

25 *Co., Ltd.*, 868 F.2d 1226, 1246-47 (Fed. Cir. 1989)(holding that a

26 district court erred in not granting an injunction because

27 "[i]nfringment having been established, it is contrary to the laws of

28 property, of which the patent law partakes, to deny the patentee's

                                    66

right to exclude others from use of his property. . . . It is the general rule that an injunction will issue when infringement has been adjudged, absent a sound reason for denying it.").

Nevertheless, the decision of whether to grant an injunction in a patent infringement case is within the Court's discretion. *Odetics, Inc. v. Storage Technology Corporation et al.*, 185 F.3d 1259, 1272 (Fed. Cir. 1999)("[W]e also recognize that district courts, as befits a question of equity, enjoy considerable discretion in determining whether the facts of a situation require it to issue an injunction."); *Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1551 (Fed. Cir. 1994) ("[E]ntitlement to an injunction implementing the right to exclude, as compared with only assessing damages against an infringer, is not absolute even during the life of a patent, but is discretionary."); *Roche Prods. v. Bolar Pharmaceutical Co.*, 733 F.2d 858, 865 (noting that whether an injunction should issue "depends on the equities of the case").[32]

Although the Court may, within its discretion, refuse to grant an injunction, it should have a good reason for doing so. *W.L. Gore & Associates, Inc. v. Garlock Inc.*, 842 F.2d 1275, 1281 (Fed. Cir. 1988) (indicating that an injunction "should issue once infringement has been established unless there is a sufficient reason for denying it."). In the past, courts have refused to grant injunctive relief when the public interest is better served by denying the injunction, and when damages sufficiently compensate the patentholder. *See Shiley, Inc. v. Bentley Laboratories, Inc.*, 601 F. Supp. 964, 969-70 (C.D.

---

[32] Masimo's representation to the Court that "there's no question that once the Court enters judgment on a patent case, that we are entitled to an injunction" was a misstatement of the law. Trial Transcript 4047:18-24.

1 Cal. 1985)("As a court of equity, the court must consider all of the

2 circumstances, including the adequacy of legal remedy, irreparable

3 injury, whether the public interest would be served, and hardship on

4 the parties and third parties."), *aff'd* 794 F.3d 1561(Fed. Cir. 1986).

5 These justifications for refusing equitable relief are relevant to

6 this case.

7     Although Masimo is correct that injunctions are typically granted

8 against products found to infringe another's patents, this case is not

9 typical. As part of its damages case, Masimo emphasized that the pulse

10 oximetry industry is unique in that hospitals strongly prefer to

11 standardize oximetry products so that the entire hospital is using one

12 manufacturer's oximeters. Masimo Damages Opening 2878: 14-19, 2879:21

13 -19; Kiani Direct 2942:25-2943:9, 2943:22-2944:22; Mosher Direct

14 2965:10-2966:12; Wagner Direct 3053:18-21, 3096:25-3101:11; *see also*

15 Jones Direct 3295:12-19 (testifying about Nellcor's bid to convert a

16 hospital). This unusual aspect of the pulse oximetry industry leads to

17 the conclusion that an injunction in this case (in the form that

18 Masimo suggested) would be against the public interest, and

19 duplicative of the jury's damage award. Consequently, Masimo's request

20 for an injunction is <u>denied</u>.

21

22 **I.   PUBLIC INTEREST**

23     The Court is not obligated to enjoin infringement if the

24 injunction would contravene the public interest. *See Mercoid Corp v.*

25 *Mid-Continent Inv. Co.*, 320 U.S. 661, 665 (1944)("It is the public

26 interest which is dominant in the patent system."); *Morton Salt Co. v.*

27 *G.S. Suppiger Co.*, 314 U.S. 488, 492 (1942)("It is a principle of

28 general application that courts, and especially courts of equity, may

1 appropriately withhold their aid where the plaintiff is using the

2 right asserted contrary to the public interest"). In this case, the

3 public interest would be disserved by an injunction against Nellcor.

4     Masimo sought and won increased damages based on the importance

5 of standardization in the pulse oximetry market; this feature of the

6 market also must weigh heavily in any analysis of the propriety of an

7 injunction. Masimo's proposed injunction would force hospitals

8 currently using Nellcor's infringing technologies to make a choice

9 between two undesirable options: either work with an amalgam of

10 oximeters of different brands, or make the substantial investment it

11 would take to convert the entire hospital to a non-infringing brand.

12 Forcing this choice would likely compromise patient safety by forcing

13 health professionals to switch back and forth between types of

14 oximeters, or by driving up the hospitals' costs and making care less

15 accessible. Thus the burden of the injunction would primarily be borne

16 by hospitals, the patients they serve, and the public who fund many of

17 them. Hospitals would be forced to either convert to Masimo's products

18 or to give up the standardization that Masimo has demonstrated is

19 important to staff training, patient care, and cost containment.

20     Injunctions have been found to be against the public interest

21 when they would affect public health or safety. *Vitamin Technologists,*

22 *Inc. v. Wisconsin Alumni Research Found.*, 146 F.2d 941, 946 (9th Cir.

23 1945) (denying an injunction on public interest grounds because the

24 holder of a patent for a process of producing Vitamin D in organic

25 substances by exposing them to UV rays refused to permit the

26 irradiation of oleomargarine, thus preventing the aid to or cure of

27 rickets), *Milwaukee v. Activated Sludge*, 69 F.2d 577, 593 (7th Cir.

28 1934)(denying an injunction that would have shut down a sewage

treatment plant, potentially sending untreated sewage into Lake
Michigan and endangering the health of the surrounding community);
see also Biogro Western Sales, Inc. v. Helena Chem. Co., 160 F.Supp.
1112, 1136 (recognizing potential jeopardy to public health as a basis
for denying a preliminary injunction). The public health impact of
this case is admittedly smaller than those at issue in Vitamin
Technologists and Activated Sludge. Nevertheless, the Court finds that
the potential impact on health care and the costs thereof would make
an injunction in this case against the public interest.

Additionally, while this Court does not decide that one company's
oximeters are better than the others', the Court recognizes that at
least some physicians will prefer Nellcor's oximeters to Masimo's
products. Deakers 3340:23-3341:3 (testifying that having the "pleth
wave" available through Nellcor's products rather than the synthesized
wave displayed by Masimo's oximeters is important to his practice of
medicine); Kim 3430:1-8 (noting that the anesthesiology group at
Huntington Memorial Hospital voted to discontinue use of Masimo's
oximeters). The Court is concerned that forcing physicians who have
been trained on one product and who prefer it in their practice to use
a different product would compromise the safety of their patients.

Although the Court's primary concern is the immediate impact an
injunction would have on the health care providers forced to bear its
costs, it is also relevant that granting an injunction now would have
repercussions well beyond the life of the patent. If an injunction
were granted, Masimo would not only control new sales of its oximetry
technology, but would essentially force hospitals that need to

1   standardize to convert to Masimo's products.[33] This would lock Masimo

2   in as the oximetry provider beyond the term of the applicable patents,

3   a further reason to find that the injunction should be denied on

4   public interest grounds.[34]

5

6   **II.  DAMAGES**

7          Typically, damages are designed to compensate for past

8   infringement, and injunctions are issued to prevent future

9   infringement.   *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750

10  F.2d 1552 (Fed. Cir. 1984). In this case, because Masimo pursued and

11  won damages for sensor sales in the future and for lost hospital

12  conversions, an injunction would allow Masimo to make sales for which

13  it has already been compensated. This potential for double recovery is

14  another reason that an injunction is not appropriate in this case.

15         Masimo received damages not only for lost sales of oximeters and

16  OEM boards but also for the lost future sales of sensors to complement

17

18         [33] Although not critical to this Court's decision, it is helpful
     to bear in mind that Masimo's patents are narrow. An injunction in
19   this case would give Masimo the opportunity to use its relatively
     small innovation to dictate the terms on which standardization could
20   be accomplished throughout the pulse oximetry industry. As compared to
     the significance of the inventions claimed in Masimo's patents, the
21   chaos and expense hospitals would be forced to undergo would be even
     more substantial.
22
           [34] Courts have frequently denied injunctions in cases of patent
23   misuse, because granting the injunction would give the patent holder a
     monopoly that extends beyond the scope of the patent. *See, e.g.,*
24   *Morton Salt Co.* 314 U.S. at 488 (denying an injunction where the
     petitioner misused its patent to create a monopoly in unpatented
25   materials). Patent misuse has not been alleged in this case and this
     Court does not assume that any misuse has occurred. Nevertheless, this
26   case is analogous to patent misuse cases in that the injunction Masimo
     proposes would, because of the nature of the oximetry market, expand
27   its monopoly beyond the monopoly to which its patents give Masimo a
     right.
28

those "sockets." Masimo's damages model assumes that Nellcor's installed base would remain constant (i.e. not be reduced by competition from Masimo) for the next 5 years, and compensates Masimo for lost profits on sensor sales to that installed base. Wagner 3207:12-17. However, if Nellcor is enjoined from competing with Masimo, its installed base will undoubtedly be diminished. *See* N.Opp:14. For each installed Nellcor oximeter that Masimo displaces it will receive a double recovery, from both the jury award and from sensor sales it makes that would otherwise have been Nellcor's sales.

Furthermore, Masimo's damages model included compensation for lost hospital conversions. If an injunction is granted in this case, because of the importance of standardization, Masimo will likely be able to convert those hospitals that wish to use the patented technology. Should those hospitals for which lost conversion damages were awarded wish to purchase additional oximeters, they will have to convert to Masimo's products to be able to standardize. Thus Masimo will receive the benefit of the actual conversion in addition to the theoretical one for which the jury awarded damages.

The Court recognizes that the majority of sales that the proposed injunction would prevent are not included within the jury's damage award, and that double compensation for conversions is a theoretical problem that may or may not occur, depending on hospitals' needs for new oximeters. However, these examples illustrate that at least some double recovery would result, and this further supports the Court's determination that an injunction is not appropriate in this case. *Carborundum Co. v. Molten Metal Equipment Innovations, Inc.*, 72 F.3d 872, 881 (Fed. Cir. 1995)("[O]nce a patentee has been fully compensated by an infringer for the use of a device embodying the

1 patented invention, a court may not grant an injunction preventing the

2 infringer from using or repairing that device."); *Stickle v. Heublein,*

3 *Inc.,* 716 F.2d 1550 (Fed. Cir. 1983).

4      Masimo argues that money damages would be insufficient because

5 without an immediate injunction, it will suffer irreparable harm.

6 Masimo's reasons for this claim, which are based largely on customer

7 relationships and industry recognition, are unconvincing.[35] The Court

8 is not persuaded that Masimo will suffer irreparable harm if an

9 injunction is not granted, and certainly does not believe that any

10 harm Masimo might suffer outweighs the impact on the public interest.

11      Given the inequitable conduct involved in pursuing the '830

12 patent, Masimo is not in a particularly strong position to ask this

13 Court for equitable relief. Nevertheless, the Court carefully

14 considered Masimo's request with an eye to the volume of precedent

15 supporting granting injunctions in cases where infringement has been

16 found. The Court has found that the standardization evidence Masimo

17 relied upon to prove its lost conversion damages claim demonstrates

18 that an injunction in this case would burden hospitals, physicians,

19 patients, and the public and give Masimo double recovery. Thus this

20 Court has decided to <u>deny</u> Masimo's request for an injunction.

21      The Court also notes that even had it found an injunction

22 appropriate in this case, the one proposed by Masimo is overinclusive,

23 ───────────────

24    [35] Nellcor also argues that it will suffer irreparable harm if
an injunction is issued, but harm to the public, rather than to the

25 infringer, is the important consideration here. That an infringing
party could be harmed or even put out of business by the injunction is

26 not sound reason to deny it. *Windsurfing International, Inc. v. AMF
Inc.,* 782 F.2d 995, 1003 (Fed. Cir. 1986) ("One who elects to build on

27 a product found to infringe cannot be heard to complain if an
injunction against constituted infringement destroys the business so

28 elected.").

1   vaguely worded and unfair.[36] For example, the Court is concerned that

2   even counsel for Masimo could not explain what the "colorably

3   different" language would mean in the context of the asserted patents.

4   *See* Hearing (June 18, 2004). Although the Court accepts that the

5   Federal Circuit has approved this language in different factual

6   circumstances, if even Masimo does not know what it means under the

7   present circumstances it would be hard to justify including it in an

8   injunction. No injunction that would require hospitals that want to

9   standardize to convert to Masimo's products would appear to be in the

10  public interest. Masimo is clearly not entitled to the injunctive

11  relief it has requested.

12

13                        **- CONCLUSION -**

14       For the most part, this memorandum of decision and order upholds

15  the jury's verdict. The Court has, however, concluded that given the

16  evidence presented and the law governing this case, the only

17  reasonable conclusion to be drawn from the evidence is that Nellcor's

18  products literally infringe claims 16 and 23 of the '222 patent and

19  claim 17 of the '850 patent, that the infringement was not willful,

20  and that the '785 patent is not infringed. The Court grants JMOL on

21  these grounds. Furthermore, the evidence presented during the bench

22  trial compels the conclusion that due to inequitable conduct in its

23  prosecution, the '830 patent is unenforceable. Finally, following a

24  careful review of the relevant case law and the facts relating to the

25  business of the parties, the Court has concluded that an injunction is

26

27  _____

28       [36] Masimo has represented that Nellcor refused to discuss the
    terms of the proposed injunction, based on Nellcor's position that no
    injunction was warranted. Hearing (June 18, 2004).

1 | not in the public interest and that damages will sufficiently

2 | compensate Masimo for its losses due to the infringement of this

3 | patent.

4 | Given this Court's ruling on the injunction, appropriate damages

5 | for sales not encompassed in the jury's damages award will require

6 | further determination. The Court will decide the appropriate damages

7 | and prejudgment interest, if any, following further oral argument on

8 | this issue. The Court does not require briefing on the issue of

9 | damages at this time, but will hear further argument on the issue of

10 | damages and interest at a time to be set by the Court.

11

12 | IT IS SO ORDERED

13

14

15 | DATED: July 12, 2004

16 | Honorable Mariana R. Pfaelzer
United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28